[No. S004784. Crim. No. 26418. June 22, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
MARTIN JAMES KIPP, Defendant and Appellant.

**COUNSEL**

Ross Thomas and John Ward, under appointments by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Garrett Beaumont, David I. Friedenberg, Carl H. Horst and Gary W. Brozio, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KENNARD, J.**—This appeal by defendant Martin James Kipp from a judgment of death comes to this court automatically. (Pen. Code, § 1239, subd. (b); all further statutory references are to this code unless otherwise indicated.) A jury convicted defendant of one count of first degree murder (§ 187) with the special circumstance that the murder was committed during an attempted rape (§ 190.2, subd. (a)(17)(iii)). The same jury also convicted defendant of one count of attempted rape by force (§§ 261, subd. (a)(2), 664), and it returned a penalty verdict of death for the first degree murder with a special circumstance. The trial court denied the automatic motion to modify penalty (§ 190.4, subd. (e)), and it pronounced a sentence of death for the murder and a sentence of three years in state prison for the attempted rape. We shall affirm the judgment.

## I. Facts and Proceedings

Antaya Howard, age 19, was found dead in her automobile. She had been beaten and strangled and the condition of her corpse and her clothing suggested that this had occurred during an actual or attempted forcible rape. When last seen alive, Howard had been with defendant, and his fingerprints were found inside her automobile. The prosecution introduced evidence that defendant had raped and killed another young woman, Tiffany Frizzell, three months before Howard met her death.

### A. *Prosecution's Guilt Phase Case-in-Chief*

In December 1983, Antaya Howard was living with her parents at their home in Huntington Beach. She owned an orange Datsun automobile. On the evening of December 29, after 10 p.m., she drove to a bar in Huntington Beach called the Bee Hive.

On the same day, December 29, 1983, defendant was staying temporarily at the Huntington Beach apartment of Kenton Wheeler, who had known defendant since childhood. Defendant left Wheeler's apartment around 10 p.m. wearing a sweater he had borrowed from Wheeler. Defendant also went to the Bee Hive. The bartender recognized Howard and defendant as previous customers, but she had not seen them together before.

In the Bee Hive, defendant sat at the bar next to Howard; they talked and drank beer. Around 1:15 a.m., defendant and Howard left the Bee Hive together, returning around 1:45. Both were showing the effects of alcohol or some other intoxicating substance, but neither appeared extremely high, and defendant seemed less impaired than Howard. Defendant and Howard each wanted another beer, but the bartender refused to serve them because they had missed the last call for drinks before the 2 a.m. closing time. Defendant and Howard departed again.

Defendant and Howard were next seen at Charlie's Chili, an all-night restaurant in Newport Beach. There, between 2 and 4 a.m., defendant and Howard drank a bottle of champagne in the company of a man with sandy hair. Howard had locked her keys in her car, but she managed to open the car using a butter knife that she borrowed from a restaurant employee. The sandy-haired man left by himself in his own car. One witness, a restaurant customer, testified that defendant and Howard left in Howard's car, with defendant driving. Another witness, a restaurant employee, testified that defendant and Howard walked toward the beach after leaving the restaurant.

Howard did not return home that night and was never seen alive again. Defendant had not returned to Wheeler's apartment at 6 a.m. on December 30 when Wheeler left for work.

Around 7 a.m. on December 30, a woman noticed a car parked in an alley behind her Huntington Beach house; this car eventually proved to be Howard's.

When Wheeler returned to his apartment at 4:30 p.m. on December 30, he found defendant in the shower. The sweater defendant had borrowed was soiled and stained on the front and arms, and the room in which defendant had slept held a very strong and sour body odor. Defendant told Wheeler he did not know why the room smelled so bad. Defendant immediately moved out and took a room in a hotel, where he stayed only one night.

On January 3, 1984, a parking control officer ticketed Howard's car for illegal parking. It was still parked in the same Huntington Beach alley where it had been observed on December 30. The next day, the woman who had first noted the car's presence observed that it was emitting a strong odor. She notified the police, who found Howard's body, covered by a blanket, on the floor behind the front seat. Her blouse had been pulled back and was missing a button. Her bra was still clasped but was twisted and above her breasts. Her jeans and panties were around her ankles. There was mud and dirt on the knees, the left side, and the back of the jeans, and also on the upper left part of Howard's body.

Defendant's fingerprints were found in Howard's car on the left and right car door windows and on an empty beer can on the front passenger seat floorboard.

The autopsy surgeon testified that the cause of Howard's death was asphyxiation due to strangulation, with blunt force injury to the head as a contributing factor. He found abrasions "in the left forehead and also over the left eyebrow area, and also in the left thigh area," and he noted bruises "over the left eyebrow, over the left eyelid, left cheek area, the left leg" and "in the back of the head and in the back of the body." Howard's skull was not fractured, but she had suffered a subarachnoid hemorrhage that could have been fatal had she not died first of strangulation. No semen or sperm was found on or in the body, but decomposition could have made semen and sperm undetectable.

On January 6, 1984, defendant surrendered to the Laguna Beach Police Department on traffic warrants. On January 10, 1984, Huntington Beach police officers interviewed defendant about Howard. Defendant claimed he did not know Howard; he was unable to explain the presence of his fingerprints in her car.

The prosecution introduced evidence that in September 1983, three months before Howard was killed, defendant had raped and killed a 19-year-old woman named Tiffany Frizzell. Her body had been found on the bed in

her Long Beach motel room on September 17, 1983. The belt used to strangle her was around her neck. The only clothing on the body was a blouse pulled over Frizzell's face. The body was covered by a bedspread, but the bedding was otherwise undisturbed. Defendant's fingerprint was found on a telephone in the room. Semen and sperm were found in Frizzell's vagina and external genital area. On September 19, 1983, a canvas bag containing clothing and other personal property belonging to Frizzell was found in some bushes at a Long Beach residence. A witness, Loveda N., testified that she had seen the same canvas bag, containing many of the same objects, in defendant's van. One of the objects found in the bag was a book in which Frizzell had written her name and which bore defendant's fingerprints. On October 13, 1983, defendant pawned a radio that had belonged to Frizzell.

### B. *Defense Case at the Guilt Phase*

The only defense witness was a toxicologist who testified to the presence of cocaine or a cocaine metabolite in blood taken from Howard's body after her death.

### C. *Penalty Phase*

The prosecution introduced evidence that defendant had assaulted June M. and Loveda N.

June M. met defendant in a Long Beach bar around 11 p.m. on June 13, 1981, when she was 23 years old. Defendant invited June to view his truck, which was parked nearby. When she was seated in the front passenger seat, ostensibly to listen to the stereo, defendant started the truck and drove to a residential area. June tried to open the passenger door but was unable to do so because the door and window handles were missing. Defendant ignored her demands to be taken back to the bar. Defendant pushed her into the back of the truck and ripped off her clothes.

June M. screamed, and defendant put his hand over her mouth. When June bit defendant's hand, he began to strangle her. Defendant raped June. Eventually her body went limp, and she thought she was going to die. Defendant got up and demanded that June orally copulate him. June said she could not breathe and needed air. When defendant opened the passenger door, she managed to escape. For this assault on June M., defendant had pleaded guilty to one count of forcible rape and had received a state prison sentence.

Loveda N. met defendant in a bar in August 1983. They began living and traveling together in defendant's van. During this time, defendant physically

abused Loveda, slapping or punching her in the face. Around October 10, 1983, while they were staying at a motel in Coos Bay, Oregon, defendant insisted that Loveda have sex with him and began to remove her clothes. When Loveda resisted, defendant hit her and choked her with his hands. Feeling she was about to pass out, Loveda told defendant she would have sex with him if he allowed her to use the bathroom first. Once inside the bathroom, she locked the door, jumped out the window, and ran to the office of the motel manager, who eventually summoned the police. Because defendant threatened to harm Loveda's three-year-old son, she declined to press charges.

The defense case at the penalty phase was presented primarily through the testimony of Daniel Foster, a clinical psychologist. Foster interviewed defendant twice and administered psychological tests, including the Minnesota Multiphase Personality Inventory. In addition, Foster reviewed many depositions and reports, and he interviewed defendant's family and childhood friends in Browning, Montana.

According to Foster, defendant's mother was a Native American woman named Little Sister Still Smoking. The birth certificate listed defendant's father as "unknown." Defendant was "a small baby, six pounds." For the first 20 months of his life, defendant lived with his mother and maternal grandmother, who were both alcoholics. They lived in an area of the Blackfoot Reservation known as "little Chicago" because it was inhabited by Native Americans who had returned to the reservation after unsuccessful attempts to settle in urban areas. It was the poorest area of the reservation, and alcoholism was endemic. Defendant's mother had several children, probably each by a different man because "for a quart of whiskey she would sleep with anybody." Defendant and his sisters were taken from his mother when social workers found them under a pile of rags in an abandoned shack during very cold weather. The children were undernourished and suffered from impetigo, skin lice, and mites.

Defendant was placed in the home of John and Mildred Kipp, who eventually adopted defendant when he was 12 years old. John Kipp was a very strong man with high standards. He did not physically abuse defendant, but he was harsh and "extremely demanding." He owned a ranch on which defendant worked.

Defendant earned his father's approval by boxing, and for several years was undefeated in boxing matches. When defendant was 15 years old, John Kipp started drinking heavily, as much as 3 quarts of whiskey in a day. He displayed a terrible temper when intoxicated. John Kipp once struck defendant in public, a major humiliation in Blackfoot culture, but defendant bore it

stoically. Around this time, John and Mildred Kipp separated. Also at this time, defendant was a passenger in a pickup truck that rolled over, killing defendant's 11-year-old cousin. Defendant began to lose boxing matches and eventually abandoned the sport, turning instead to alcohol and sex. John Kipp kept defendant supplied with money.

John Kipp died when defendant was 19 years old, leaving defendant a half interest in the ranch, which was then heavily mortgaged. Defendant joined the Marine Corps. He advanced quickly to the rank of lance corporal, then appeared to succumb to boredom and disillusionment after being stationed in Okinawa and assigned clerical duties. Defendant turned to drugs, sex, and petty crime. Eventually he was discharged from the service and imprisoned for the rape of June M. In prison, defendant learned to play bass guitar and became involved in heavy metal music. After release from prison, defendant attempted to live out his fantasy of being a heavy metal rock star, supporting himself with money he received from his half interest in his father John Kipp's ranch.

According to Dr. Foster, defendant displayed several characteristics common to adult children of alcoholic parents: He was isolated, he had no grasp of what normal behavior was, he had difficulty following a project from beginning to end, he often lied when it would have been just as easy to tell the truth, he was highly self-critical, he had difficulty maintaining an intimate relationship, and he was extremely impulsive.

The defense also presented the testimony of Scott Whiting and Kenton Wheeler. Whiting had known defendant for approximately two months immediately before his arrest on the charges in this case. He testified that defendant had a high tolerance for cocaine. Ken Wheeler testified that he and defendant grew up together, living on adjoining farms and attending the same schools. Wheeler regarded defendant as his best friend; he testified that defendant had been a "good kid" and "well disciplined." Defendant had also been "an inspiration athletically" and "just had a glow about him." Defendant had joined the Marines because he wanted to be like his father, John Kipp, who had been a "war hero." Drug use in the Marines was heavy at that time, and defendant seemed changed after his discharge from the Marines.

## II. Jury Selection

### A. *Exclusion of Hispanics From Orange County Jury Panels*

Before jury selection began, defendant moved to quash all current and available jury panels on the ground that the procedures used to summon

prospective jurors in Orange County systematically produced juries on which Hispanics were substantially underrepresented. The defense and the prosecution stipulated that the evidence and argument presented on a similar motion then pending in People v. Ramos (Super. Ct. Orange County, 1987, No. C-42382) would be deemed incorporated by reference as the evidence and argument presented on defendant's motion. After this stipulation was entered, the superior court denied the motion in the Ramos case, and this ruling was incorporated as the ruling on defendant's motion. Defendant now contends that the court erred in denying the motion, and that the effect of the error was to deny him his constitutional right to trial by an impartial jury drawn from a representative cross-section of the community (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16).

This court has previously reviewed the same trial court ruling, and it has concluded that the trial court did not err in denying the motion. (*People* v. *Ramos* (1997) 15 Cal.4th 1133, 1152-1157 [64 Cal.Rptr.2d 892, 938 P.2d 950].) That ruling is controlling here.

B. *Juror Bias*

■ During the death-qualification phase of jury selection, the trial court permitted defendant to pose one question in person to certain of the prospective jurors, in addition to the questions posed by the trial court and counsel. During the death qualification voir dire of Mary Wallis, the following exchange occurred:

"[Defendant]: Is there anything about my appearance or your past that would cause you not to give me a fair trial?

"[Wallis]: I must say, I am sorry, yes there is. And that's the way it is.

"[Defense counsel]: I'm sorry?

"[Wallis]: Yes, there was something in his appearance that turned me off.

"[Defense counsel]: Would you mind sharing it? Hair?

"[Wallis]: It's the totality. It's not one thing. It's not your hair. It's not your pallor. If anything, it was the muscles in your arms, the gestalt. I'm sorry sir. I was turned off."

The defense did not challenge Wallis for cause, nor did it exercise a peremptory challenge against her. She was seated on the jury that returned the guilt and penalty verdicts.

Based on these events, defendant contends that the trial court erred in not acting on its own initiative to excuse Wallis for cause. He further contends that this error had the effect of denying him his rights to due process of law, to a trial by a fair and impartial jury, and to reliable determinations of guilt and penalty, all in violation of the federal and state Constitutions (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15-17).

To raise a claim on appeal that a juror should have been excused for cause, a defendant must have exhausted his peremptory challenges or must justify his failure to do so. (*People* v. *Ramos, supra,* 15 Cal.4th 1133, 1158-1159; *People* v. *Raley* (1992) 2 Cal.4th 870, 904-905 [8 Cal.Rptr.2d 678, 830 P.2d 712].) Here, the defense did not exhaust its peremptory challenges, nor does defendant justify the failure to do so. Indeed, at trial the defense expressed no dissatisfaction with the jury ultimately selected.

Rejecting the same contention defendant makes here, we recently said: "[T]his court has never imposed on the trial court an independent, affirmative obligation to excuse a prospective juror notwithstanding counsel's failure to exercise a peremptory challenge for that purpose. The decisional and statutory authorities cited do not support that proposition. (See former Code Civ. Proc., § 223 . . . ; former Pen. Code, § 1078 . . . ; *People* v. *Mattson* (1990) 50 Cal.3d 826, 845 [268 Cal.Rptr. 802, 789 P.2d 983]; *Morgan* v. *Illinois* (1992) 504 U.S. 719, 729-730 [112 S.Ct. 2222, 2229-2230, 119 L.Ed.2d 492].) While the authority to control voir dire includes the power to excuse prospective jurors for cause (see *People* v. *Jimenez* (1992) 11 Cal.App.4th 1611, 1621 [15 Cal.Rptr.2d 268], disapproved on other grounds in *People* v. *Kobrin* (1995) 11 Cal.4th 416 [45 Cal.Rptr.2d 895, 903 P.2d 1027]), it does not impose a sua sponte duty to do so." (*People* v. *Bolin* (1998) 18 Cal.4th 297, 315-316 [75 Cal.Rptr.2d 412, 956 P.2d 374], fn. omitted.)

In a supplemental brief, defendant contends that, based on her voir dire responses quoted above, Wallis was unfit to serve as a juror and therefore the trial court had an obligation under section 1089 to discharge Wallis *after* the jury was sworn. He argues that a trial court error in not discharging Wallis after jury selection, rather than before, is preserved for appellate review despite the failure to exhaust peremptory challenges.

We reject this claim. Defendant does not assert that any new information relevant to Wallis's qualifications or fitness to serve came to the trial court's attention after the jury was sworn, but only that the obligation to prevent a biased juror from serving was a continuing one. If accepted, this theory would allow a party who did not challenge a prospective juror for cause, and

who has not exhausted peremptory challenges or justified the failure to do so, to obtain appellate review whenever it could be claimed that a juror's responses on voir dire demonstrated bias. We decline to permit circumvention of the challenge exhaustion requirement in this fashion. .

In any event, we find the claim lacking in merit. "The decision whether to investigate the possibility of juror bias, incompetence, or misconduct, as well as the ultimate decision whether to retain or discharge a juror, rests within the sound discretion of the trial court." (*People* v. *Bradford* (1997) 15 Cal.4th 1229, 1351 [65 Cal.Rptr.2d 145, 939 P.2d 259].) We find no abuse of discretion in this instance. The trial court could reasonably determine, and impliedly did determine, that despite Wallis's expressed distaste for defendant's appearance, she would faithfully discharge the oath she took as a juror to impartially determine the facts and apply the law to reach a just verdict. (See *U.S.* v. *Quintero-Barraza* (9th Cir. 1995) 78 F.3d 1344, 1350 [rejecting a similar claim].)

C. *Ineffective Assistance of Counsel*

Defendant contends that during jury selection his appointed counsel failed to provide him with the effective assistance to which he was entitled under the state and federal Constitutions (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15). In particular, defendant contends that his trial counsel should have challenged Juror Wallis, either for cause or peremptorily, and that counsel should have asked each prospective juror whether he or she would automatically vote for the death penalty after learning that defendant was guilty of not one but two murders, that the victim of each murder was a young woman, and that defendant had killed each victim while raping or attempting to rape her.

Before considering these claims individually, we set forth the legal principles that govern them. To establish a violation of the constitutional right to effective assistance of counsel, a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to defendant in the sense that it "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 686 [104 S.Ct. 2052, 2064, 80 L.Ed.2d 674]; see also *People* v. *Wader* (1993) 5 Cal.4th 610, 636 [20 Cal.Rptr.2d 788, 854 P.2d 80].) If a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether counsel's performance was deficient. (*Strickland* v.

*Washington, supra,* 466 U.S. at p. 697 [104 S.Ct. at pp. 2069-2070].) If the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." (*People* v. *Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

### 1. *Failure to Challenge Prospective Juror*

The facts underlying this claim have been set forth above. Briefly, the defense did not challenge prospective juror Wallis, either for cause or peremptorily, after she answered in the affirmative when defendant inquired whether there was anything about his appearance "that would cause [her] not to give [defendant] a fair trial." She then explained that there was "something in [defendant's] appearance that turned [her] off" and that it was "the totality" or "the gestalt." Wallis was selected to serve and did serve on the jury that returned verdicts at the guilt and penalty phases.

The appellate record contains no explanation for defense counsel's failure to challenge prospective juror Wallis. Counsel was not asked to explain it, nor did he volunteer an explanation, nor did he make any remarks that might be construed, directly or indirectly, as an explanation. Therefore, on direct appeal we must reject the claim of ineffective assistance of counsel, "unless there simply could be no satisfactory explanation." (*People* v. *Pope, supra,* 23 Cal.3d 412, 426.)

Defendant has not demonstrated that there could be no satisfactory explanation for counsel's omission. For example, defense counsel may have reasonably concluded, based on Wallis's appearance, demeanor, and responses to voir dire, that she was a fair-minded person who, if selected for the jury, would make a determined and ultimately successful effort not to allow her distaste for defendant's personal appearance to influence her judgment as to his guilt or as to the appropriate penalty. In reaching the decision not to challenge Wallis for cause, counsel may also have been appropriately influenced by her responses to questions concerning her death penalty views. When asked what purpose she thought the death penalty serves, Wallis replied: "I think it only serves as a deterrent to other people. I—I don't like the death penalty—I'm not into putting people to death." Asked to elaborate, she said: "My feelings are definitely not to kill a person. There's no two ways about that. I've got to be up front about that. I would not go for the death penalty unless it were absolutely necessary. I would tilt to life without possibility of parole."

Based on this response, counsel may have evaluated Wallis as being predisposed to select a sentence of life without parole rather than death, and

counsel may have concluded that this characteristic outweighed her manifest dislike for defendant's appearance. (See *People* v. *Montiel* (1993) 5 Cal.4th 877, 911 [21 Cal.Rptr.2d 705, 855 P.2d 1277] ["Because the use of peremptory challenges is inherently subjective and intuitive, an appellate record will rarely disclose reversible incompetence in this process."].)

### 2. *Failure to Examine on Voir Dire*

■ On the first day of the death-qualification portion of the voir dire, the trial court ruled that prospective jurors could be asked this question: "If the evidence shows that Mr. Kipp has committed another rape-murder, would you automatically vote for the death penalty, knowing that, or would you keep an open mind . . . and base your decision on evidence presented at the penalty phase and the guilt phase?" Thereafter, a question in substantially this form was posed, by either the trial court or defense counsel, to all but 15 of the 91 prospective jurors who underwent the death-qualification process. Defendant claims that his trial counsel performed deficiently by failing to ask this question of these 15 prospective jurors, 2 of whom served on defendant's jury.

As with trial counsel's failure to challenge Wallis, the appellate record contains no explanation for defense counsel's failure to pose this question to a relatively small number of the prospective jurors. Counsel was not asked to explain it, nor did he volunteer an explanation, nor did he make any remarks that might be construed, directly or indirectly, as an explanation. Therefore, on direct appeal we must reject the claim of ineffective assistance of counsel, "unless there simply could be no satisfactory explanation." (*People* v. *Pope, supra,* 23 Cal.3d 412, 426.)

Defendant has not demonstrated that there could be no satisfactory explanation for counsel's omission. For example, defense counsel may have concluded from their responses to other questions that these prospective jurors would be favorably inclined to the defense, and counsel may have decided that any further voir dire would increase the risk that the prospective jurors would be challenged by the prosecution.

Finally, even assuming we were to find deficient performance, defendant has failed to demonstrate prejudice. The record does not demonstrate that any juror who actually served should have been excused for cause; mere speculation that additional questioning might have disclosed a ground for challenge is insufficient to warrant relief. (See *People* v. *Holt* (1997) 15 Cal.4th 619, 705 [63 Cal.Rptr.2d 782, 937 P.2d 213]; *People* v. *Freeman* (1994) 8 Cal.4th 450, 487 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th

888]; *People* v. *Fauber* (1992) 2 Cal.4th 792, 846, fn. 17 [9 Cal.Rptr.2d 24, 831 P.2d 249].)

### III. GUILT PHASE

#### A. *Admission of Evidence*

##### 1. *Uncharged Rape-Murder*

 Before jury selection commenced, the prosecution moved to admit, and the defense moved to exclude, evidence that defendant had committed the uncharged rape-murder of Tiffany Frizzell. The prosecution argued that the evidence was relevant to prove that defendant was Antaya Howard's killer and that when committing that crime he had acted with intent to rape and to kill. The defense argued that the evidence had little or no relevance on the issues of identity and intent because the two killings were more dissimilar than similar. The motions were submitted on the prosecution's offer of proof, the transcript of the preliminary hearing in this case, and the arguments of counsel, without the taking of additional evidence. The trial court ruled the evidence admissible. Defendant contends that this ruling was erroneous.

Evidence that a defendant has committed crimes other than those currently charged is not admissible to prove that the defendant is a person of bad character or has a criminal disposition; but evidence of uncharged crimes is admissible to prove, among other things, the identity of the perpetrator of the charged crimes, the existence of a common design or plan, or the intent with which the perpetrator acted in the commission of the charged crimes. (Evid. Code, § 1101.) Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent. (*People* v. *Ewoldt* (1994) 7 Cal.4th 380, 402-403 [27 Cal.Rptr.2d 646, 867 P.2d 757].) On appeal, the trial court's determination of this issue, being essentially a determination of relevance, is reviewed for abuse of discretion. (*People* v. *Scheid* (1997) 16 Cal.4th 1, 14 [65 Cal.Rptr.2d 348, 939 P.2d 748]; *People* v. *Alvarez* (1996) 14 Cal.4th 155, 201 [58 Cal.Rptr.2d 385, 926 P.2d 365]; *People* v. *Gordon* (1990) 50 Cal.3d 1223, 1239 [270 Cal.Rptr. 451, 792 P.2d 251]; see also *People* v. *Hayes* (1990) 52 Cal.3d 577, 617 [276 Cal.Rptr. 874, 802 P.2d 376]; *U.S.* v. *Khan* (9th Cir. 1993) 993 F.2d 1368, 1376.)

 To be relevant on the issue of identity, the uncharged crimes must be highly similar to the charged offenses. (*People* v. *Ewoldt, supra,* 7 Cal.4th

380, 403.) Evidence of an uncharged crime is relevant to prove identity only if the charged and uncharged offenses display a " 'pattern and characteristics . . . so unusual and distinctive as to be like a signature.' " (*Ibid.*, quoting 1 McCormick on Evidence (4th ed. 1992) § 190, pp. 801-803.) "The strength of the inference in any case depends upon two factors: (1) the *degree of distinctiveness* of individual shared marks, and (2) the *number* of minimally distinctive shared marks." (*People* v. *Thornton* (1974) 11 Cal.3d 738, 756 [114 Cal.Rptr. 467, 523 P.2d 267], italics in original, disapproved on other grounds in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1].)

Viewing the evidence in the light most favorable to the trial court's ruling, the charged and uncharged offenses displayed common features that revealed a highly distinctive pattern. In both instances, the perpetrator strangled a 19-year-old woman in one location, carried the victim's body to an enclosed area belonging to the victim (Howard to her car, Frizzell to her motel room), and covered the body with bedding (Howard with a blanket, Frizzell with a bedspread). The caked dirt and mud on the clothing and body of Antaya Howard indicated that she had not been assaulted and strangled in her car, and both the trial court and the jury could reasonably infer that her killer had carried her body from the place where she was killed to her car and had covered it with the blanket that the police removed when they opened the car. The undisturbed condition of the bedding in Tiffany Frizzell's motel room indicated that she had not been assaulted and killed on the bed, and the absence of any signs of forced entry into the motel room or of a struggle within that room, suggested that Frizzell had been killed elsewhere and the perpetrator had thereafter carried her body to the motel room, placed it on the bed, and covered it with the bedspread. This inference draws added support from the testimony of Loveda N. that she had observed in defendant's van a bag that was later discarded in a residential area and found to contain Frizzell's clothing and personal effects. The presence of this bag in defendant's van supports the inference that Frizzell had been in defendant's company away from the motel and had been killed in a location other than the motel. We note also that the bodies of both victims were found with a garment on the upper body, while the breasts and genital area were unclothed, that in neither instance had the victim's clothing been torn, and that the bodies of both victims had been bruised on the legs.

Based on both the number and the distinctiveness of the shared characteristics, we conclude that the trial court did not abuse its discretion when it ruled that the charged and uncharged offenses display a pattern so unusual and distinctive as to support an inference that the same person committed both.

■ A lesser degree of similarity is required to establish relevance on the issue of common design or plan. (*People* v. *Ewoldt, supra,* 7 Cal.4th 380, 402.) For this purpose, "the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual." (*Id.* at p. 403.) ■ Here, the common features noted above indicate that when defendant committed the charged Howard offenses and the uncharged Frizzell offenses he was acting pursuant to a common plan or design to forcibly rape and to kill the young women he had chosen as his victims.

■ The least degree of similarity is required to establish relevance on the issue of intent. (*People* v. *Ewoldt, supra,* 7 Cal.4th 380, 402.) For this purpose, the uncharged crimes need only be "sufficiently similar [to the charged offenses] to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' " (*Ibid.*) ■ Considering the shared characteristics noted above, we conclude also that the trial court did not abuse its discretion when it ruled that the charged and uncharged offenses are sufficiently similar to support an inference that defendant harbored the same intent—to rape and to kill—in each instance.

■ There is an additional requirement for the admissibility of evidence of uncharged crimes: The probative value of the uncharged offense evidence must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury. (*People* v. *Ewoldt, supra,* 7 Cal.4th 380, 404-405.) On appeal, a trial court's resolution of these issues is reviewed for abuse of discretion. (*Id.* at p. 405.) A court abuses its discretion when its ruling "falls outside the bounds of reason." (*People* v. *De Santis* (1992) 2 Cal.4th 1198, 1226 [9 Cal.Rptr.2d 628, 831 P.2d 1210].)

■ We find no abuse of discretion here. As noted above, the Frizzell and Howard crimes displayed the same highly distinctive features, so that evidence of the Frizzell crimes had substantial probative value on the issues of identity, common plan or design, and intent in the Howard crimes. That probative value is further enhanced by the proximity of the two incidents in time (Frizzell died on September 17, 1983, Howard on December 30, 1983) and in location (Frizzell's body was found in Long Beach, Howard's body in the nearby City of Huntington Beach). Additionally, evidence of the two sets of crimes came from independent sources (see *People* v. *Ewoldt, supra,* 7 Cal.4th 380, 404-405), because they were separately investigated by different law enforcement agencies and proved by the testimony of different witnesses. Finally, the prosecution substantially relied upon evidence of the Frizzell crimes to prove material and disputed factual issues. The prosecution was required to prove in its case-in-chief that defendant was Howard's

killer and that he killed intentionally during the course of an actual or attempted rape. When the trial court ruled the evidence admissible, defendant had not conceded any of these facts, nor did the prosecution have other evidence that proved these material disputed facts so conclusively that evidence of the Frizzell crimes could be excluded as merely cumulative.[1] (See *id.* at pp. 405-406.)

Against this substantial probative value on material and contested issues, we must weigh the danger of undue prejudice to defendant, of confusing the issues, or of misleading the jury. Evidence of the Frizzell crimes posed a substantial danger of prejudice to defendant because a jury would be inclined to view evidence that defendant had raped and killed Tiffany Frizzell as evidence of his criminal propensities, and because a jury might well view defendant as deserving of punishment for the Frizzell crimes regardless of his guilt of the Howard murder. But prejudice of this sort is inherent whenever other crimes evidence is admitted (*People* v. *Ewoldt, supra,* 7 Cal.4th 380, 404), and the risk of such prejudice was not unusually grave here. The Frizzell crimes were not significantly more inflammatory than the Howard crimes, the evidence that defendant committed both crimes was compelling, and the jury was correctly instructed on the purposes for which it might consider the evidence of the Frizzell crimes. Considering all of the relevant factors, we conclude that the trial court did not exceed the bounds of reason when it concluded that the probative value of evidence of the Frizzell crimes was not substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

■ Defendant further contends that his trial attorney performed deficiently, to defendant's prejudice, by not moving to strike evidence of the Frizzell rape-murder, and to have the jury instructed to disregard this evidence, after the trial court granted the defense motion to dismiss the charge of rape, and after trial counsel conceded, in closing argument to the jury, that whoever had strangled Antaya Howard had acted with intent to kill.

Dismissal of the rape charge, after the prosecution had finished presenting its case-in-chief, did not remove from the case the issue of whether defendant had intended to rape Antaya Howard. Although the trial court found insufficient evidence of a completed rape, it did not rule there was insufficient evidence of an attempted rape, and defendant was charged with both

---

[1] The trial court excluded at the guilt phase the evidence of defendant's attempted rape of June M. because it concluded that, once evidence of the Frizzell crimes was admitted, evidence of the June M. incident would be merely cumulative. Evidence of the June M. incident was admitted at the penalty phase as part of the prosecution's case-in-aggravation.

the attempted rape of Howard and the special circumstance of murder in the attempted commission of rape. Accordingly, dismissal of the rape charge had no effect on any of the issues on which evidence of the Frizzell crimes was admitted.

We may assume, as defendant urges, that intent to kill was no longer a disputed issue after defense counsel conceded during the guilt phase argument to the jury that whoever strangled Antaya Howard acted with intent to kill. Still, the other issues for which evidence of the Frizzell crimes had been admitted—identifying defendant as Howard's killer and the existence of intent to rape—remained in dispute. Because the evidence of the Frizzell crimes was properly received on those issues, there was no sound legal basis for a motion to strike that evidence or to instruct the jury to disregard it. Measured against the standard of a reasonably competent attorney, defense counsel's performance was not deficient merely because counsel failed to make these meritless motions.

## 2. *Testimony of Tiffany Frizzell's Mother*

Before the prosecution began presenting evidence of the Frizzell crimes, the defense moved to exclude testimony by Tiffany Frizzell's mother. Counsel asserted that the proposed testimony was irrelevant and was excludable under Evidence Code section 352. The prosecutor stated that the mother would identify her daughter and would identify also, as belonging to her daughter, certain items of property that the prosecution would link to defendant. The trial court remarked that testimony identifying the victim and her property was "probably proper." Defense counsel inquired whether the court would be swayed if the defense offered to stipulate that the property was Frizzell's. The trial court then inquired whether the prosecutor could stipulate to these facts, but the prosecutor stated he did not think it would work out. Observing that the mother's testimony would "carry more weight," the trial court denied the motion to exclude. Defendant contends that the trial court erred in so ruling because a stipulation would have eliminated any need for testimony by Tiffany Frizzell's mother. He argues that the ruling prejudiced him because the subsequent testimony by the mother "distracted the jury from its legitimate task while improperly engendering sympathy for the victim and her mother and hostility toward [defendant]."

This court has stated that "the testimony of a parent to establish the identity of a murder victim may not be relevant if there is an offer to stipulate to the facts to be established by the testimony." (*People* v. *Wash* (1993) 6 Cal.4th 215, 247 [24 Cal.Rptr.2d 421, 861 P.2d 1107].) We assume

that the same is true of testimony of a murder victim's parent identifying the victim's property. Nevertheless, defendant was not prejudiced. The testimony of Tiffany Frizzell's mother was brief, factual, and, so far as the record shows, included no overt emotional display. As we have concluded in similar situations, we conclude here that the testimony "had no potential to inflame the jurors and hence could not have exposed defendant to prejudice." (*People* v. *Bonin* (1989) 47 Cal.3d 808, 849 [254 Cal.Rptr. 298, 765 P.2d 460]; see also *People* v. *Wash, supra*, 6 Cal.4th 215, 247; *People* v. *Raley, supra*, 2 Cal.4th 870, 896.)

### 3. *Photograph of Tiffany Frizzell in Life*

██ During her testimony, Tiffany Frizzell's mother identified a photograph, later admitted into evidence, portraying her daughter at some point during her life. Defendant contends that both the photograph and the testimony concerning it were irrelevant and inadmissible because it was never disputed that the young woman whose body was found in the motel room was Tiffany Frizzell.

Because the defense did not object to this particular evidence at trial, the issue of its admissibility is not preserved for appellate review. (Evid. Code, § 353, subd. (a).) Anticipating this conclusion, defendant contends that defense counsel rendered ineffective assistance of counsel by not objecting to this evidence. We reject the claim of ineffective assistance of counsel for lack of prejudice. Neither the testimony nor the photograph was inflammatory, and the evidence of defendant's guilt of the charged offenses was strong. We therefore conclude that it is not reasonably probable that, had the defense succeeded in excluding both the photograph and the testimony, defendant would have obtained a more favorable verdict. (See *People* v. *Raley, supra*, 2 Cal.4th 870, 895; *People* v. *Taylor* (1990) 52 Cal.3d 719, 731 [276 Cal.Rptr. 391, 801 P.2d 1142]; *People* v. *Kelly* (1990) 51 Cal.3d 931, 963 [275 Cal.Rptr. 160, 800 P.2d 516].)

### B. *Jury Instructions*

#### 1. *Circumstantial Evidence*

██ Defendant challenges the language of standard jury instructions concerning circumstantial evidence that the trial court used, at the request of defendant's trial counsel, to instruct the jury at the guilt and penalty phases of his trial. Specifically, he challenges CALJIC No. 2.01 (4th ed. 1979) (sufficiency of circumstantial evidence in general), CALJIC No. 2.02 (1980 rev.) (sufficiency of circumstantial evidence to prove specific intent or

mental state), CALJIC No. 8.83 (4th ed. 1979) (sufficiency of circumstantial evidence to prove special circumstance generally), and CALJIC No. 8.83.1 (4th ed. 1979) (sufficiency of circumstantial evidence to prove mental state required for special circumstance). Defendant argues that these instructions undermine the prosecution's burden of proving guilt beyond a reasonable doubt and amount to an impermissible mandatory presumption of guilt.

As this court has explained in prior decisions, these instructions properly direct the jury to accept an interpretation of the evidence favorable to the prosecution and unfavorable to the defense only if no other "reasonable" interpretation can be drawn. Particularly when viewed in conjunction with other instructions correctly stating the prosecution's burden to prove defendant's guilt beyond a reasonable doubt, these circumstantial evidence instructions do not reduce or weaken the prosecution's constitutionally mandated burden of proof or amount to an improper mandatory presumption of guilt. (*People* v. *Holt, supra,* 15 Cal.4th 619, 679; *People* v. *Crittenden* (1994) 9 Cal.4th 83, 144 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People* v. *Wilson* (1992) 3 Cal.4th 926, 942-943 [13 Cal.Rptr.2d 259, 838 P.2d 1212].) Because the instructions are correct statements of pertinent law, we conclude as well that trial counsel's action in requesting them was not deficient when measured against the standard of a reasonably competent attorney.

## 2. *Willfully False Testimony*

Defendant also challenges this standard jury instruction: "If you find that before this trial [a] [the] defendant made false or deliberately misleading statements concerning the charge upon which he is now being tried, you may consider such statements as a circumstance tending to prove a consciousness of guilt but it is not sufficient [by] itself to prove guilt. The weight to be given such a circumstance and its significance, if any, are matters for your determination." (CALJIC No. 2.03 (4th ed. 1979).) Defendant contends that this instruction constituted an impermissibly argumentative pinpoint instruction and improperly permitted the jury to consider defendant's false statements as a circumstance in deciding his mental state at the time of the charged offenses.

As defendant acknowledges, we have rejected the same arguments in prior cases. (*People* v. *Jackson* (1996) 13 Cal.4th 1164, 1223-1224 [56 Cal.Rptr.2d 49, 920 P.2d 1254]; *People* v. *Arias* (1996) 13 Cal.4th 92, 142 [51 Cal.Rptr.2d 770, 913 P.2d 980]; *People* v. *Kelly* (1992) 1 Cal.4th 495, 532 [3 Cal.Rptr.2d 677, 822 P.2d 385].) We see no reason to reconsider the soundness of these conclusions.

## IV. Penalty Phase

### A. *Ineffective Assistance of Counsel*

#### 1. *Failure to Object to Evidence of Attempted Oral Copulation*

At the penalty phase, June M. testified that she met defendant in a bar; that defendant invited her to listen to the stereo in his truck; that after she was seated in the truck defendant drove away without her permission; that she was unable to leave because the handles for the passenger door and window were missing; that after stopping in a quiet residential area defendant forced her into the back of the truck, where he ripped off her clothing and raped her while strangling her to stop her screams; that after the rape defendant demanded that she orally copulate him; that she promised to do so if defendant would open a door to let air in; and that she was able to escape after defendant opened a door. Based on this testimony, the jury was instructed that evidence had been introduced that defendant had kidnapped, raped, attempted to orally copulate, and attempted to murder June M., and that the jury could consider such crimes as aggravating circumstances if it was persuaded beyond a reasonable doubt that defendant had committed them. Defendant contends that his trial counsel rendered ineffective assistance in not objecting to the testimony and to the instruction insofar as they concerned the offense of attempted forcible oral copulation. Relying on a Court of Appeal decision holding that a mere solicitation of an unlawful sexual act is not sufficient to prove a criminal attempt to commit that act (*People* v. *La Fontaine* (1978) 79 Cal.App.3d 176 [144 Cal.Rptr. 729]), defendant argues that the evidence at the penalty phase was insufficient as a matter of law to support a finding that defendant was guilty of attempted forcible oral copulation of June M. We disagree.

An attempt to commit a crime requires a specific intent to commit the crime and a direct but ineffectual act done toward its commission. (*People* v. *Dillon* (1983) 34 Cal.3d 441, 452-453 [194 Cal.Rptr. 390, 668 P.2d 697].) The act must go beyond mere preparation, and it must show that the perpetrator is putting his or her plan into action, but the act need not be the last proximate or ultimate step toward commission of the substantive crime. (*Id.* at p. 453.) Here, defendant does not dispute the sufficiency of the evidence to demonstrate a specific intent to commit forcible oral copulation, but only the sufficiency of the evidence to establish a direct but ineffectual act done toward its commission. We are satisfied that the evidence showed such acts.

June M.'s testimony described not merely a solicitation of an unlawful sexual act, but a demand accompanied by acts of forcible coercion. Defendant's demand for oral copulation followed an extended series of coercive

acts, during which he kidnapped June, forcibly removed her clothing, and choked her while raping her. The situation is thus analogous to a defendant who kidnaps another person, displays a firearm, and demands money. If the transaction is interrupted at that point, no one would doubt that the defendant is guilty of an attempted robbery, because the actual or attempted use of force is sufficient to move the transaction beyond the sphere of mere preparation and into the zone of actual commission of the crime of robbery. So also where the crime is forcible oral copulation: A demand for oral copulation that follows or is accompanied by the actual or attempted use of force amounts to more than mere preparation. We conclude, accordingly, that June M.'s testimony is sufficient to support a finding that defendant committed the crime of attempted forcible oral copulation. For this reason, trial counsel's failure to object to the evidence or the instructions does not show deficient performance when measured against the standard of a reasonably competent attorney.

### 2. Failure to Raise Double Jeopardy Defense

Defendant contends that his trial attorney performed deficiently, in violation of his constitutional right to the effective assistance of counsel, by not raising a double jeopardy defense (see U.S. Const., 5th Amend.; Cal. Const., art. I, § 15) as a ground for excluding evidence of the kidnapping and sexual assault of June M. He contends that the defense applies because he had previously been convicted, based on a guilty plea, of forcible rape for the same conduct.

Defendant acknowledges that in prior decisions this court has rejected the claim that at the penalty phase of a capital prosecution, the presentation of past criminal conduct for which the defendant has been convicted and punished places the defendant in jeopardy for that earlier crime. (*People* v. *Osband* (1996) 13 Cal.4th 622, 711 [55 Cal.Rptr.2d 26, 919 P.2d 640]; *People* v. *Garceau* (1993) 6 Cal.4th 140, 199-200 [24 Cal.Rptr.2d 664, 862 P.2d 664]; *People* v. *Visciotti* (1992) 2 Cal.4th 1, 71 [5 Cal.Rptr.2d 495, 825 P.2d 388]; *People* v. *Melton* (1988) 44 Cal.3d 713, 756, fn. 17 [244 Cal.Rptr. 867, 750 P.2d 741].) Defendant fails to persuade us that these decisions should be reconsidered. His trial attorney's failure to assert a meritless defense does not demonstrate ineffective assistance of counsel.

### B. Jury Instructions

### 1. Failure to Instruct That Death Penalty Will Be Carried Out

Defendant contends that the trial court erred in not instructing the jurors, on its own initiative, to assume that if they returned a verdict of death

the penalty of death would be carried out. He argues that the instruction became necessary after the court told some of the jurors, during the selection process, that notorious murderers like Charles Manson had escaped the death penalty because the death penalty law under which they had been sentenced had been declared invalid.

The trial court's remarks about the Manson case were in the context of an explanation that, because the death penalty law under which Manson was originally sentenced had been declared unconstitutional, Manson was now technically eligible for parole. The trial court went on to explain that the current trial was proceeding under a different and later death penalty law specifying that a defendant convicted of first degree murder with a special circumstance could be sentenced only to death or to life imprisonment without possibility of parole and so would never be eligible for parole. A reasonable juror would not have understood the trial court's remarks as an invitation to speculate on the possibility that the current death penalty law might some day be held unconstitutional. Far from suggesting that a death verdict would not result in execution, the trial court effectively assured the jurors that what had happened in the Manson and similar cases would not reoccur in this case.

We have previously rejected the argument that "because of a commonly held misconception to the contrary, jurors will not appreciate the actual consequences of their sentencing choice, thereby undermining the reliability of the verdict." (*People* v. *Hawthorne* (1992) 4 Cal.4th 43, 75 [14 Cal.Rptr.2d 133, 841 P.2d 118].) As in that decision, the record here fails to substantiate defendant's premise "that there exists a widespread misperception among penalty phase jurors that 'death' means anything other than eventual execution of the defendant." (*Id.* at p. 75, fn. omitted.) Significantly, nothing in the instructions actually given, or in the arguments of counsel, "suggested the jury's decision was merely an academic exercise with only theoretical consequences." (*Id.* at p. 76; see also *People* v. *Sanders* (1995) 11 Cal.4th 475, 562 [46 Cal.Rptr.2d 751, 905 P.2d 420].)

As this court has explained in prior cases, because of the possibility of appellate reversal or gubernatorial commutation or pardon, it would be inaccurate and therefore erroneous to instruct the jury that if it returns a death verdict, the sentence of death *will* inexorably be carried out. (*People* v. *Holt, supra,* 15 Cal.4th 619, 688; *People* v. *Jones* (1997) 15 Cal.4th 119, 189 [61 Cal.Rptr.2d 386, 931 P.2d 960]; *People* v. *Hawthorne, supra,* 4 Cal.4th 43, 76.) Although it is not improper to instruct the jury to *assume* that whatever penalty it selects will be carried out (*People* v. *Sanders, supra,* 11 Cal.4th 475, 561-562), an instruction phrased in this qualified language may

unnecessarily raise questions in the jurors' minds. Therefore, we have not required that trial courts so instruct the jury in every penalty phase. The trial court may give the instruction at the defendant's request and should give this or a comparable instruction if there is a reason to believe the jury may have some concerns or misunderstanding in this regard. (See *People* v. *Hines* (1997) 15 Cal.4th 997, 1073 [64 Cal.Rptr.2d 594, 938 P.2d 388]; *People* v. *Jackson, supra,* 13 Cal.4th 1164, 1234; *People* v. *Davis* (1995) 10 Cal.4th 463, 548 [41 Cal.Rptr.2d 826, 896 P.2d 119].)

This court has noted that brief references to commutation and similar possibilities during jury selection are generally insufficient to mandate clarifying instructions at the penalty phase. (*People* v. *Carpenter* (1997) 15 Cal.4th 312, 360-361 [63 Cal.Rptr.2d 1, 935 P.2d 708]; *People* v. *Pinholster* (1992) 1 Cal.4th 865, 918-919 [4 Cal.Rptr.2d 765, 824 P.2d 571].) Because the record in this case does not demonstrate a plausible basis to infer jury concerns or misunderstanding about the consequences of its penalty verdict, the trial court was not required to instruct the jury on its own initiative to assume when deliberating on and selecting the penalty verdict that a verdict of death would inexorably result in defendant's execution.

### 2. *Guilt Phase Instruction to Disregard Consequences*

The trial court instructed the jury at the guilt phase, in the language of CALJIC No. 1.00 (4th ed. 1979), that both the prosecution and the defense had a right to expect that the jury would "reach a just verdict regardless of what the consequences of such verdict may be." Defendant contends that the trial court erred at the penalty phase in not instructing the jury to disregard this earlier admonition. He argues that instructing the jury at the penalty phase to disregard the consequences of its penalty verdict impermissibly weakened the jury's sense of responsibility for the outcome of its deliberations.

As this court has explained, "language instructing the jury to disregard the consequences of its verdict is inappropriate and should not be given at the *penalty* phase of a capital trial." (*People* v. *Ray* (1996) 13 Cal.4th 313, 354 [52 Cal.Rptr.2d 296, 914 P.2d 846], italics in original.) But we have generally declined to find prejudice when the instruction is viewed as part of the entire charge, reasoning that the jury is almost certain to understand "that it was entitled to disregard only those 'consequences' not constitutionally relevant to its sentencing decision, and that it bore the ultimate responsibility for choosing between death and life imprisonment

without parole based on the particular circumstances of the case." (*Id.* at p. 355; see also *People* v. *Arias, supra,* 13 Cal.4th 92, 171; *People* v. *Mayfield* (1993) 5 Cal.4th 142, 183 [19 Cal.Rptr.2d 836, 852 P.2d 331].)

 Here, the instruction to disregard consequences was not given or repeated at the penalty phase. The jury was properly instructed on the penalty determination process in the language of CALJIC No. 8.84.1 (1986 rev.), which told the jury to consider, in reaching its penalty verdict, any circumstance that "extenuates the gravity of the crime, even though it is not a legal excuse for the crime [and any sympathetic or any other aspect of the defendant's character or record [that the defendant offers] as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. . . . [and to] disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle." In their arguments to the jury, counsel stressed the gravity of the jury's penalty decision, with defense counsel stressing the jury's "God-like power" to determine whether or when defendant would die. Accordingly, we conclude that there is no reasonable possibility the penalty verdict would have been more favorable to defendant had the trial court expressly instructed the jury that in reaching its penalty verdict it was required to disregard the "regardless of the consequences" instruction given at the guilt phase.

### 3. *Instruction on Aggravating and Mitigating Circumstances*

CALJIC No. 8.84.1 (1986 rev.) is the standard jury instruction on aggravating and mitigating circumstances. Defendant contends that this instruction, which the trial court read to the jury in this case, failed to channel the jury's discretion sufficiently to avoid arbitrary and capricious imposition of the death penalty because the instruction did not give sufficiently explicit and narrow definitions to section 190.3, factors (a) (circumstances of the capital crime), (b) (other criminal activity involving the use or attempted use of force or violence), and (i) (defendant's age), because it included factors inapplicable to defendant's case,[2] and because it did not state which factors were aggravating and which mitigating.

Both this court (*People* v. *Bacigalupo* (1993) 6 Cal.4th 457, 474-479 [24 Cal.Rptr.2d 808, 862 P.2d 808]; *People* v. *Tuilaepa* (1992) 4 Cal.4th 569, 594-595 [15 Cal.Rptr.2d 382, 842 P.2d 1142]) and the United States Supreme Court (*Tuilaepa* v. *California* (1994) 512 U.S. 967, 975-977

---

[2]Here, the trial court offered to delete irrelevant penalty factors from the instruction, but defense counsel requested that all factors be included.

[114 S.Ct. 2630, 2636-2638, 129 L.Ed.2d 750]) have rejected vagueness challenges to section 190.3, factors (a), (b), and (i). This court has rejected the argument that the various sentencing factors must be labeled for the jury as aggravating or mitigating and also the argument that inapplicable sentencing factors should be omitted from the instruction. (*People* v. *Williams* (1997) 16 Cal.4th 153, 268-269 [66 Cal.Rptr.2d 123, 940 P.2d 710].) We see no reason to reconsider any of these conclusions.

### 4. *Instruction on Penalty Determination*

CALJIC No. 8.84.2 (1986 rev.) is the standard jury instruction describing the process of penalty determination. Defendant contends that this instruction, which the trial court read to the jury in this case, is constitutionally defective in various ways.

This court has rejected each of the arguments defendant makes here. We have determined that the instruction is not impermissibly vague and misleading as to the jury's duty to return a death verdict only if the aggravating circumstances outweigh the mitigating circumstances and only if death is the appropriate punishment. (*People* v. *Sanchez* (1995) 12 Cal.4th 1, 80-81 [47 Cal.Rptr.2d 843, 906 P.2d 1129]; *People* v. *Breaux* (1991) 1 Cal.4th 281, 315-316 [3 Cal.Rptr.2d 81, 821 P.2d 585].) We have determined that the trial court need not expressly instruct the jury that a sentence of life imprisonment without parole is mandatory if the aggravating circumstances do not outweigh those in mitigation (*People* v. *Duncan* (1991) 53 Cal.3d 955, 978 [281 Cal.Rptr. 273, 810 P.2d 131]), that a sentence of life imprisonment without parole is permissible even if the aggravating circumstances outweigh those in mitigation (*People* v. *Rodrigues* (1994) 8 Cal.4th 1060, 1192 [36 Cal.Rptr.2d 235, 885 P.2d 1]), or that the jury should return a death verdict only if aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt or only if death is beyond a reasonable doubt the appropriate penalty (*People* v. *Sanchez, supra,* 12 Cal.4th 1, 80-81). Nor is the trial court required to instruct the jury that the prosecution has the burden of persuasion as to penalty. (*People* v. *Hayes* (1990) 52 Cal.3d 577, 643 [276 Cal.Rptr. 874, 802 P.2d 376].) Finally, the trial court need not instruct the jury to make separate unanimous findings of the truth of specific aggravating circumstances or to render a statement of reasons in the event it returns a verdict of death. (*People* v. *Bradford* (1997) 14 Cal.4th 1005, 1059 [60 Cal.Rptr.2d 225, 929 P.2d 544]; *People* v. *Pride* (1992) 3 Cal.4th 195, 268 [10 Cal.Rptr.2d 636, 833 P.2d 643].) We decline to reconsider these conclusions.

## V. AUTOMATIC MOTION TO MODIFY PENALTY

Defendant contends that he was denied his constitutional right to the effective assistance of counsel (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15) by the actions of his trial attorneys in moving that he be granted probation, and in failing to object to the trial court's consideration of the presentence report, which contained information prejudicial to defendant, before ruling on the automatic motion to modify penalty (§ 190.4, subd. (e)). We reject the claim for failure to demonstrate a reasonable probability that the trial court would have modified the penalty were it not for the acts and omissions of which defendant complains.

After the jury rendered its penalty verdict, defendant's trial attorneys moved on his behalf for a new trial, to strike the special circumstance finding, and to reduce the penalty of death. The motion papers do not refer to an application for probation. In preparation for sentencing, the probation officer prepared a presentence report. The report contained information adverse to defendant, including a description of the mental suffering that Antaya Howard's death had caused her mother, references to defendant's threats against jail personnel, and the record of a theft defendant had committed while in the military.[3] The report stated that defendant was ineligible for probation after his conviction of first degree murder with a special circumstance.

At a hearing held on September 18, 1987, the court referred to "defendant's application for probation dated September 18th, 1987," saying it had "read and considered that" and that it was denying probation because defendant was statutorily ineligible. The parties then argued defendant's motions for new trial and to strike the special circumstance. The court denied these motions and explained its reasons for doing so. The court announced it would consider next the automatic motion to modify penalty, and it mentioned that it had "read the probation report" in addition to the papers submitted by the parties. The parties then argued this motion. The court denied the motion, giving a detailed explanation for its ruling.

Defendant contends that the negative information in the presentence report may have caused the trial court to deny the automatic motion to modify penalty, and that this result is attributable to the deficient performance of his trial attorneys, first in making a futile application for probation on his behalf, thereby causing the preparation of the presentence report, and second by not

---

[3]The theft had been mentioned at the penalty phase by defense witness Daniel Foster.

objecting when the trial court announced it had read and considered the presentence report before ruling on the automatic motion to modify.

Some of the factual underpinnings of defendant's reasoning are open to question. First, it is not entirely clear from the record that his attorneys did apply for probation on his behalf. Although the trial court referred to a written application for probation, the appellate record contains no such document, and defendant's trial attorneys did not refer to such an application either at the hearing or in the written motion papers that appear in the appellate record. Therefore, it is possible that the trial court misspoke in referring to a defense application for probation. We question also defendant's apparent assumption that absent a probation application no presentence report would have been prepared. (See § 1203, subd. (g) [trial court may request presentence report when defendant ineligible for probation].) We do not rest our decision on these grounds, however.

■ A trial court should not read or consider a presentence report before ruling on an automatic motion to modify penalty. (*People* v. *Williams, supra,* 16 Cal.4th 153, 282.) If the court has done so, we examine the record to determine whether the court may have been improperly influenced by material in the report. (*Ibid.*) If the court does not mention any material in the report when giving its reasons for denying the modification motion, we conclude there was no improper influence. (*People* v. *Hines, supra,* 15 Cal.4th 997, 1076-1077; *People* v. *Holt, supra,* 15 Cal.4th 619, 694-695.) ■ Here, the trial court's statement of reasons cited only the evidence presented at trial, not extraneous information in the presentence report. Therefore, even assuming for purposes of argument that counsel's performance was deficient when measured against the standard of reasonably competent attorneys, there was no resulting prejudice to defendant.

## VI. CUMULATIVE PREJUDICE

Defendant contends that the trial court errors and the instances of deficient trial counsel performance that he has identified, even if nonprejudicial when considered individually, had a cumulative effect, resulting in prejudice sufficient to warrant reversal of the judgment of death.

We have considered each of defendant's claims on the merits, and neither singly nor cumulatively do they establish prejudice requiring the reversal of the convictions or the judgment of death. Defendant was not denied his federal constitutional rights to a fair trial and to a reliable penalty verdict (U.S. Const., 5th, 8th, & 14th Amends.).

## VII. Disposition

The judgment is affirmed.

George, C. J., Mosk, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

Appellant's petition for a rehearing was denied August 12, 1998.