Filed 7/12/21  P. v. Hines CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>ADRIEN SHONTERREL HINES,<br><br>      Defendant and Appellant. | C088131<br><br>(Super. Ct. No. 18FE002528) |

After getting out of a car where there was a handgun on the floorboard by his seat, defendant Adrien Shonterrel Hines was detained, arrested, and eventually convicted of being a felon in possession of a firearm (Pen. Code, § 29800, subd. (a)(1))[1] with a gang enhancement (§ 186.22, subd. (b)(1)).  The trial court sustained the prior strike, serious felony, and prior prison term allegations (§§ 1170.12, 667, subd. (a), 667.5, subd. (b)) and sentenced defendant to a 13-year state prison term.

---

[1]      Undesignated statutory references are to the Penal Code.

1

He contends on appeal that admitting expert testimony on gang members' knowledge of whether a gun is in a car they are in was an abuse of discretion that violated due process, that prior uncharged misconduct evidence regarding an incident where he previously possessed a gun deprived him of a fair trial, and the matter must be remanded to allow the trial court to determine whether to strike the serious felony allegation. In a supplemental brief, he contends the prison prior must be stricken in light of Senate Bill No. 136.

The expert testimony and prior misconduct evidence were properly admitted. While the prison prior must be stricken, there is no need to remand for an exercise of discretion regarding the serious felony allegation, as the trial court indicated it would not strike the enhancement if the law giving it the discretion to do so had been in effect. We shall remand with directions to strike both prison priors and for resentencing in light of the stricken prison priors, and otherwise affirm.

BACKGROUND

*The Incident*

On the afternoon of February 7, 2018, Sacramento County Sheriff's Deputy Amanda Smith and her partner Timothy Mullin were patrolling in a north Sacramento area near Truax Court and Edison Avenue where a gang shooting recently occurred. Deputy Smith noticed four to six Black males standing around a silver Mercedes in a parking lot. When the deputies made a U-turn to head back to the men, the Mercedes pulled out ahead of them. The officers followed the Mercedes. The Mercedes drove for about a mile before pulling over near an apartment complex and parking in a carport stall. The deputies pulled into a second entrance at the complex and saw the occupants of the vehicle: codefendant Raheem Isaiah Thomas was the driver, codefendant Isaiah Malik Taylor exited from the back seat, and defendant, who had been in the front passenger seat, was standing just outside the car. Defendant and Thomas had prior felony convictions; Taylor was subject to a court order not to possess any firearms.

2

Taylor made eye contact with Deputy Smith and started to walk away. When Deputy Smith ordered him to stop and walk back, Taylor complied. The deputy handcuffed and searched Taylor, finding a loaded nine-millimeter handgun in his front pants pocket. Deputy Mullen detained defendant, who was unarmed. After placing Taylor and defendant in the back seat of the patrol car, Deputy Smith assisted Deputy Mullin with Thomas. As she came to the Mercedes, Deputy Smith saw a black and red handgun with an illegal high-capacity magazine on the passenger-side floorboard. The gun was loaded and had a chambered round.

Deputy Smith had Thomas exit the Mercedes at gunpoint. His cell phone contained images of him holding the black and red handgun. A photograph of a gun on Thomas's cell phone matched the serial number of the gun taken from the car.

Defendant told Deputy Mullin his DNA and fingerprints would be on the "red" gun, but it did not belong to him. He also told the deputy that the gun was not on the floorboard when he and Taylor left the Mercedes.

No fingerprints were found on either firearm or the ammunition. The guns were not registered to any of the defendants.

A photo of Thomas holding the black and red firearm was posted on his social media accounts.

*Gang and Prior Misconduct Evidence*

In October 2013, defendant was stopped for reckless driving on his way to a funeral for a known member of the Starz gang. Three Starz members were in the car with defendant.

In August 2015, Sacramento Sheriff's Detective Joseph Ellis and his partner were in the Meadowview area trying to locate defendant when they saw him in a community center. The officers were out of uniform and in an unmarked car, so they called for backup. A helicopter spotted defendant throwing something into a dumpster as he went into an apartment complex. A .40-caliber Glock 22 with 14 rounds was found in that

dumpster. Defendant initially denied knowledge of the gun, but after being informed there was a helicopter video, he admitted throwing the gun in the dumpster and said he carried it to deal with rival gang members. Defendant initially denied gang membership but eventually admitted he was in the Trigga Mob and hung out with the Guttah Gass (Guttah) gang. Both gangs are affiliated with each other and fall under the umbrella of the G-Mobb gang; they are enemies of the Oak Park Bloods and the Strawberry Manor Bloods.

Sacramento Sherriff's Detective Nick Sareeram testified as an expert on African American street gangs in the Sacramento area. The two main original African American gangs in the Sacramento area were the G-Mobb and Garden Blocc Crips. G-Mobb continues to be an overarching umbrella group with several affiliated subsets. Guttah and Starz are two subsets of G-Mobb, sharing information and resources with each other. They all work together. Firearms are one of the resources the gangs share; Detective Sareeram personally observed this during a four-month-long wiretap investigation.

G-Mobb has about 225 members. It and its subsets Starz and Guttah each have identifying hand signs and symbols. Eschewing specific colors, the gangs identify with designer clothing acronyms or initials corresponding to letters in the gang's name, such as Gucci. Members have common tattoos such as stars or the Gucci symbol. The gangs no longer claim specifically defined territories but instead operate from hubs or bases. The primary activities of G-Mobb and its subsets are illegal firearm possession, assault with a deadly weapon, attempted murder, and narcotic sales. Their primary rival is the Oak Park Bloods and its subsets.

Firearms are important in gang culture. Gangs need them to commit assaults, engage in violence, and to send messages to rival gangs. Firearms also create fear, thereby discouraging people from coming forward as witnesses. Members need firearms when going out in public in order to ward off members of rival gangs. Being unarmed in a public place at the same time a member of a rival gang is present could be fatal to the

4

unarmed gang member. As a result, gangs use social media to establish they are armed in order to generate fear and respect.

Gang members share firearms with each other for a variety of reasons. Older members subject to more prison time for unlawful possession of a firearm will hand them off to younger members. A firearm also will be shared with a gang member who has lost his gun and needs one to commit a crime. In the detective's experience, gang members who are in a vehicle together all know who is and who is not armed. This is important so that a gun can be retrieved when needed, such as when a member becomes incapacitated. There are also tactical reasons to know who is armed; the gunman needs to be on the correct side of the vehicle during a driveby shooting. Members tell each other who is armed, either orally or through text messages.

The area near Edison Avenue and Truax Court is a hub for G-Mobb and its subsets, and is an area where homicides and shootings happen on a somewhat regular basis. Detective Sareeram identified all three defendants based on his personal encounters with them. Thomas admitted membership in the criminal street gang Starz Up. Defendant and Taylor had appeared in Thomas's social media posts in the weeks prior to the incident. Thomas flashed gang signs and showed the red and black handgun in videos posted to his account. Photographs of defendant throwing gang signs were in his social media account. Detective Sareeram concluded that defendant was an active member of G-Mobb, claiming the Guttah and Trigga Mob subsets.

## DISCUSSION

### I

*Expert Testimony on Firearm Sharing was Proper*

Defendant contends that allowing expert testimony by Detective Sareeram on firearm sharing by gang members was an abuse of discretion that violated his due process right to a fair trial. We disagree.

5

A. *Background*

During pretrial motions, the trial court granted the prosecution's motion to admit expert evidence on G-Mobb and its affiliates and their motives for carrying firearms, without prejudice to defense objections regarding hearsay and facts not in evidence. The court also ruled, based on defendant's motion, to exclude expert opinion regarding defendant's or a hypothetical person's intent or mental state, and ruled that no expert can testify to what is "in somebody else's head," or offer an opinion on what someone intended or knew. However, an expert could testify to general knowledge, general understandings, things the expert learned in his or her studies or experience. The expert could not testify to the ultimate issue, whether something was done in furtherance of the street gang or with the motive to further the gang. The court also granted defendant's motion to exclude expert testimony about someone's specific intent or motive. Asked by the prosecutor if an expert could testify that gang members know "XYZ," the court ruled the expert could testify about the whole issue of arming, can state that gangs are typically armed, and can give reasons why they are armed.

As previously recounted, the expert testified, over defendant's objection, that gang members in a car would know who was armed and who was not. This is in case a member became incapacitated or for tactical reasons, like setting up advantageous positioning for the shooter in a driveby shooting. Members communicated whether they were armed, either orally or through text messages.

Detective Sareeram also testified that photographs showing Taylor and Thomas in possession of the same gun was important as it was proof that these two gang members shared guns. In his experience, gang members as a whole shared their guns. Later, he testified that it was the practice of gang members to share guns within a car. The following exchange between the prosecutor and Detective Sareeram then took place:

"Q: So there's guns in the car. You have three people there and one gun. Each person could share the gun with each other?

"A: Correct.

"Q: Can you give an example of where gang members will share guns with each other?

"A: I think this case is a perfect example of that; to be honest."

The trial court overruled defendant's objection to the answer.

B. *Analysis*

A person with special knowledge, skill, experience, training, or education in a particular field may testify as an expert witness and give an opinion if the subject matter is sufficiently beyond common experience that the expert's opinion would assist the trier of fact. (Evid. Code, §§ 720, 801.) The culture and habits of criminal street gangs meet this criterion, and the prosecution may use hypothetical questions that track the evidence, even if only " 'thinly disguised,' " to establish the crime was gang related. (*People v. Vang* (2011) 52 Cal.4th 1038, 1045 (*Vang*).)

"The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion. [Citations.]" (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

Defendant contends the testimony that if one gang member has a gun in a car, every gang member knows it was there is improper opinion testimony. According to defendant, the testimony was improper because the expert testified to the subjective knowledge and intent of each occupant of the vehicle instead of the general expectations of gang members. He finds the trial court's decision to allow this testimony an abuse of discretion that deprived him of due process.

Defendant relies on *People v. Killebrew* (2002) 103 Cal.App.4th 644 (*Killebrew*), which held improper a gang expert's testimony that when one gang member in a car possesses a gun, every other gang member in a three-car caravan knows of the gun. (*Id.* at p. 652.) The expert explained his reasoning, i.e., the occupants in all three cars were

7

from the same gang; perpetrators of a driveby shooting earlier that evening had identified themselves as members of that gang; and any members out driving that night would expect retaliation and would therefore be armed. (*Id.* at p. 652, fn. 7.) The problem in the view of the *Killebrew* court was that the expert testified to the "subjective knowledge and intent of each occupant in each vehicle. Such testimony is much different from the expectations of gang members in general when confronted with a specific action." (*Id.* at p. 658.) Because the expert's testimony was the only evidence of knowledge and intent, it did nothing more than inform the jury how the expert believed the case should be decided. (*Ibid.*)

The California Supreme Court has since said *Killebrew* has "limited significance" because it did not explain how the expert, who testified through hypothetical questions, was testifying about the specific defendant on trial in that matter. (*Vang, supra*, 52 Cal.4th at p. 1047 [" 'It would be incorrect to read *Killebrew* as barring the questioning of expert witnesses through the use of hypothetical questions regarding hypothetical persons' " (italics omitted)].) To the extent *Killebrew* was correct in prohibiting expert testimony about whether specific defendants acted for a gang purpose, the reason is not that such testimony might embrace the ultimate issue in the case (Evid. Code, § 805 [expert testimony is allowed even if it embraces ultimate issue to be decided]), but rather that it is of no assistance to the jurors, who are just as competent as the expert to weigh the evidence and draw a conclusion on the issue of guilt. (*Vang,* at p. 1048.) The *Vang* court concluded that the gang expert in that case "could not testify directly whether [the defendants] committed the assault for gang purposes" because he was not at the scene and "had no personal knowledge whether any of the defendants assaulted [the victim] and, if so, how or why." (*Ibid.*) Under those circumstances, the court found that "[t]he jury was as competent as the expert to weigh the evidence and determine what the facts were, including whether the defendants committed the assault." (*Ibid.*) The court also determined that the expert "properly could, and did, express an opinion, based on

8

hypothetical questions that tracked the evidence, whether the assault, if the jury found it in fact occurred, would have been for a gang purpose." (*Ibid.*)

Unlike the expert in *Killebrew*, the expert here did not testify, either directly or through hypotheticals, that defendant or any of the codefendants constructively possessed the black and red handgun. Whether and how gang members share firearms is not something within common knowledge, making it an appropriate subject for expert testimony. As *Vang* and Evidence Code section 805 make clear, an expert's testimony can embrace an ultimate issue, and the use of hypothetical questions tracking the facts of the case can be a proper way to elicit expert testimony. The expert did testify that this case was an example of gang members sharing firearms, but he also personally witnessed photographs of codefendants Taylor and Thomas each possessing the black and red handgun, which he testified was an example of gang members sharing firearms. Since two of the three gang members in the car had shared this firearm previously, Detective Sareeram had knowledge of that sharing and could testify that this case was an example of gang members sharing a firearm. Knowledge that a firearm is present in the car does not necessarily equate to possessing that firearm. Taylor had a loaded handgun in his front pant pocket when he exited the Mercedes; while defendant may have known about this weapon according to Detective Sareeram's testimony, he was not charged with possessing it and there was no reason to infer he constructively possessed the weapon. The expert testimony here explained to the jury how a weapon possessed by two of the gang members could wind up on the floorboard in front of the seat where the third gang member, defendant, had been sitting. To the extent *Killebrew* is valid on this point after *Vang*, it does not prevent the expert testimony at issue here.

The expert testimony on gun sharing was a proper subject for expert opinion, was not prejudicial, was based on personal knowledge of the expert where needed, and did not intrude on the jury's function. In short, overruling the objections to this line of questioning was not an abuse of discretion. Accordingly, we similarly reject defendant's

argument that the court's ruling violated his right to due process. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 998 [proper application of the rules of evidence ordinarily does not violate due process].)

II

*Prior Misconduct Evidence*

Defendant contends the prior misconduct evidence regarding his being found in possession of a firearm on the way to a gang member's funeral was inadmissible propensity evidence that violated his due process right to a fair trial. We disagree.

As a general rule, evidence the defendant has committed crimes other than those for which he is on trial is inadmissible to prove the criminal disposition or propensity of the accused. (Evid. Code, § 1101, subd. (a).) "The evidence may be used to establish a person's knowledge as well as motive, opportunity, intent, preparation, plan, identity, and the absence of mistake or accident." (*People v. Felix* (2019) 41 Cal.App.5th 177, 184-185; Evid. Code, § 1101, subd. (b).) " 'To be admissible, there must be some degree of similarity between the charged crime and the other crime, but the degree of similarity depends on the purpose for which the evidence was presented.' [Citation.] This court has held that '[w]hether similarity is required to prove knowledge and the degree of similarity required depends on the specific knowledge at issue and whether the prior experience tends to prove the knowledge defendant is said to have had in mind at the time of the crime.' [Citation.]" (*Felix,* at pp. 184-185.) "In some cases, only a general similarity may be required, because the knowledge at issue can be derived from different experiences." (*Id.* at p. 185.)

"The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal,

10

intent accompanying such an act . . . .' [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.)

Uncharged crimes can also be evidence of motive, such as when " 'the uncharged act evidences the existence of a motive, but the act does not supply the motive. . . . [T]he motive is the cause, and both the charged and uncharged act are effects. *Both crimes are explainable as a result of the same motive*.' [Citation.]" (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1381.)

Even when the evidence of a defendant's uncharged criminal conduct is relevant to some fact at issue, to be admissible the evidence must not contravene other policies limiting admission, such as Evidence Code section 352. (*People v. Ewoldt, supra,* 7 Cal.4th at p. 404.) Under Evidence Code section 352, the court must consider whether the probative value of the evidence is substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. Because evidence of uncharged crimes is considered inherently prejudicial, such evidence is admissible only when it has "substantial" probative value. (*People v. Foster* (2010) 50 Cal.4th 1301, 1331.)

We review a trial court's rulings on admission or exclusion of evidence for abuse of discretion. (*People v. Kipp* (1998) 18 Cal.4th 349, 371.) Under this standard, a trial court's ruling will not be disturbed unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Foster, supra*, 50 Cal.4th at pp. 1328-1329.)

The uncharged misconduct evidence was relevant to prove defendant knowingly possessed the gun found at his feet, and that his motive in possessing it was to benefit the gang. The prior misconduct was also relevant to defendant's willingness to try to conceal firearm possession before being apprehended by law enforcement, which again showed

11

his knowledge and motive.  It thus supports an inference that he knew about the gun at his feet and that he intended to possess it to advance a gang purpose.

We also find the evidence is not unduly prejudicial.  It involves the same type of criminal conduct as in the charged offense, unlawful weapon possession, a crime that is not inherently inflammatory or likely to evoke an emotional reaction from the jury.  As with the expert testimony, admitting this evidence was not an abuse of discretion and likewise did not deprive defendant of his right to a fair trial.

III

*Senate Bill No. 1393*

Defendant contends that Senate Bill No. 1393, which was enacted shortly after sentencing, requires this case to be remanded so that the trial court can determine whether to strike the five-year serious felony enhancement.

At the time of sentencing, the trial court had no discretion but to impose the enhancement.  (See former § 1385, subd. (b) [Stats. 2014, ch. 137, § 1].)  While this appeal was pending, however, the Governor signed into law Senate Bill No. 1393, which granted trial courts the discretion not to impose the enhancement.  (Stats. 2018, ch. 1013, §§ 1, 2, amending §§ 667, subd. (a) & 1385.)  The act was effective January 1, 2019.

There is no dispute Senate Bill No. 1393 applies retroactively to defendant.  (*People v. Jones* (2019) 32 Cal.App.5th 267, 272.)  But remand is not automatic.  Remand is not required where " 'the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken [the] . . . enhancement' even if it had the discretion.  [Citation.]  [¶]  The trial court need not have specifically stated at sentencing it would not strike the enhancement if it had the discretion to do so.  Rather, we review the trial court's statements and sentencing decisions to infer what its intent would have been." (*Id*. at pp. 272-273.)

At sentencing, the trial court said it was aware of pending legislation that would allow the court to strike the prison prior, but it would decline to strike the prior if given

12

the discretion as defendant committed the current offense shortly after leaving prison. When the prosecutor asked if this reasoning applied to the five-year serious felony enhancement, the court said it did as well.

Since the court indicated it would not strike the enhancement if given the discretion to do so, remanding for this purpose would waste judicial resources. We accordingly decline defendant's request for a remand.

IV

*Senate Bill No. 136*

Defendant contends and the Attorney General agrees that the prison prior must be stricken in light of Senate Bill No. 136. The Attorney General notes two priors were sustained, with one stayed pursuant to section 654, and admits both must be stricken. We agree with the Attorney General.

On October 8, 2019, the Governor signed Senate Bill No. 136, which amended section 667.5, effective January 1, 2020. (Stats. 2019, ch. 590, § 1.) Senate Bill No. 136 narrowed eligibility for the one-year prior prison term enhancement to those who have served a prior prison sentence for a sexually violent offense.

Defendant's prior prison term at issue was not for a sexually violent offense. Defendant is therefore entitled to the ameliorative benefit of the statute if Senate Bill No. 136 is applied retroactively. We agree with the parties that the amendment to Senate Bill No. 136 should be applied retroactively in this case.

Whether a particular statute is intended to apply retroactively is a matter of statutory interpretation. (See *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 307 [noting " 'the role of a court is to determine the intent of the Legislature' "].) Generally speaking, new criminal legislation is presumed to apply prospectively unless the statute expressly declares a contrary intent. (§ 3.) However, where the Legislature has reduced punishment for criminal conduct, an inference arises under *In re Estrada* (1965) 63 Cal.2d 740, " 'that, in the absence of contrary indications, a legislative body ordinarily

13

intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' [Citations.]" (*Lara*, at p. 308.) "A new law mitigates or lessens punishment when it either mandates reduction of a sentence or grants a trial court the discretion to do so. [Citation.]" (*People v. Hurlic* (2018) 25 Cal.App.5th 50, 56.)

Senate Bill No. 136 narrowed who was eligible for a section 667.5, subdivision (b) prior prison term enhancement. There is nothing in the bill or its associated legislative history that indicates an intent that the court not apply this amendment to all individuals whose sentences are not yet final. Under these circumstances, we find that *In re Estrada*'s inference of retroactive application applies. (Accord, *People v. Lopez* (2019) 42 Cal.App.5th 337, 340-342 [Sen. Bill No. 136 applies retroactively to cases not yet final on appeal]; *People v. Jennings* (2019) 42 Cal.App.5th 664, 680-682 [same].) Appellate courts in this situation typically direct the trial court to strike defendant's prior prison term enhancements and "remand the matter for resentencing to allow the court to exercise its discretion in light of the changed circumstances." (*Jennings,* at p. 682.) We shall do so here.

14

## DISPOSITION

The matter is remanded to the trial court with directions to strike both prior prison term enhancements and for resentencing consistent with this opinion.  In all other respects, the judgment is affirmed.

                                              /s/
                                         BLEASE, Acting P. J.

We concur:

    /s/
DUARTE, J.

    /s/
KRAUSE, J.