Filed 5/28/25  P. v. Lopez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RAFAEL LOPEZ LOPEZ,<br><br>    Defendant and Appellant. | F087831<br><br>(Super. Ct. No. BF193330A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Judith K. Dulcich, Judge.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary, Chung Mi Choi, and Hannah Janigian Chavez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Rafael Lopez Lopez was charged with first degree premeditated murder (Pen. Code,[1] §§ 187, subd. (a), 189, subd. (a) [count 1]) and possession of an assault rifle (§ 30605 [count 2]). In connection with count 1, the information alleged he personally and intentionally discharged a firearm and proximately caused the death of Rafael Gonzalez[2] (§ 12022.53, subd. (d)). Defendant filed a motion pursuant to the California Racial Justice Act of 2020 (§ 745; added by Stats. 2020, ch. 317, § 3.5) (RJA), which was denied. The jury found him guilty as charged and found true the special allegation. The trial court imposed 25 years to life—plus 25 years to life for the firearm discharge enhancement—on count 1 and a concurrent two years on count 2. On appeal, defendant contends the trial court erroneously denied his RJA motion because he proved a violation of the statute by a preponderance of the evidence. We disagree and affirm the judgment.

**STATEMENT OF FACTS**

## I. Prosecution's case-in-chief

### a. *Testimony of R.G.*

R.G. is Gonzalez's brother. In the small hours of February 4, 2023, R.G. and Gonzalez were working as security guards at a gas station across from a nightclub. They were responsible for collecting fees from nightclub patrons parking at the gas station and watching their vehicles. At approximately 1:30 a.m., Gonzalez was "sitting in front of the store with his back against the store" and R.G. was "sitting next to one of the gas pumps" when the latter heard multiple gunshots in rapid succession. R.G. saw "a man standing" "at the end of the alley" "shooting towards" Gonzalez. The perpetrator had a black firearm and was wearing "a blue-checkered jacket and a mask." Gonzalez arose

---

[1] Subsequent statutory citations refer to the Penal Code.

[2] Because defendant and the victim share the same first name, we hereafter identify the victim by his surname to avoid confusion.

and then collapsed to the ground. He sustained numerous gunshot wounds and would succumb to his injuries.

"A couple of months" before the shooting, R.G. and Gonzalez were on duty when a man parked a dark-colored sports utility vehicle (SUV) with "shiny rims" and "ran into the club" to avoid paying the fee. When the man returned, Gonzalez approached him and tried to collect the money. The man "got angry" and "started an argument with" Gonzalez. Eventually, the man got into the SUV and "almost ran [Gonzalez] over." Before the man "sped off," Gonzalez "pulled out a bat" and struck the passenger side of the vehicle "where the window is at in the back."

b. *Testimony of P.V.*

P.V. was Gonzalez's girlfriend. She provided transportation for Gonzalez and R.G. to and from the gas station. On February 4, 2023, at about 1:30 a.m., P.V. was inside her vehicle, which "was parked near the entrance by the store." She was dozing off when she was roused by gunfire. P.V. spotted the shooter, who "was near [her] vehicle on the passenger side on [the] front end of the car." He wore a ski mask and "a black long-sleeve." P.V. then "looked towards" Gonzalez, who "stood up" "after the shots were fired" and "fell face forward."

Two months prior to the shooting, P.V. witnessed an altercation at the gas station from inside her vehicle. R.G. tried to collect the parking fee from a man, but the latter "ran inside the club because he did not want to pay." When the man came back, Gonzalez confronted him and an argument ensued. At some point, Gonzalez grabbed a baseball bat to "scare" the man, but he "accidentally let the bat go" and "hit the back window" of the man's dark-colored SUV.

3.

c. *Testimony of G.G.*[3]

In February 2023, G.G. and defendant were roommates. Sometime after midnight on February 3, 2023, G.G. received a phone call from defendant asking for a ride to the nightclub. A few minutes later, the two met outside their apartment building where defendant's black Ford Explorer was located. G.G. could easily identify this vehicle "[b]ecause of the rims." G.G. drove the Explorer while defendant sat in the backseat. As they approached the nightclub, defendant directed G.G. to "go around" twice. At some point, defendant stated he "was just going to handle his business." Per defendant's instruction, G.G. parked behind a nearby restaurant. Defendant exited the vehicle and told G.G. "to wait for him." Within two minutes, G.G. heard gunshots. When defendant returned, he was carrying an AR-15. G.G. recognized the "fully automatic" weapon because he and defendant "shot it before" "in the outskirts, by some hills," in October 2022. Defendant got into the front passenger's seat, tossed the AR-15 in the backseat, and advised G.G. to "drive normal." G.G. drove "straight home." Later that afternoon, around 2:00 or 3:00 p.m., G.G. accompanied defendant as the latter drove past the gas station and nightclub. They were arrested shortly thereafter.

d. *Law enforcement*

On February 4, 2023, at 1:28 a.m., ShotSpotter—a system of "microphones throughout the city that triangulate gunshots or sounds that are above the decibels of gunshots"—detected "19-round shots fired" in the vicinity of the gas station. Officers dispatched to the scene retrieved thirteen .223-caliber casings, "a caliber of ammunition usually fired from a rifle" such as an AR-15. The gas station's surveillance footage showed the shooter wielding "a short-barreled rifle" and wearing a ski mask, white shirt, jacket with "some type of logo on the left breast," and athletic shoes "with a very large,

---

[3] G.G. was initially charged as a codefendant in the instant case. He agreed to testify truthfully in exchange for a reduced sentence.

bright white sole with a dark upper." Surveillance camera footage from other businesses and residences near or en route to the gas station showed a dark-colored SUV with "chrome wheels." License plate reader technology captured the vehicle's license plate number and a records search thereof established defendant as the registered owner.

On February 4, 2023, at around 4:00 p.m., Detective Puryear of the Bakersfield Police Department was driving to a local business when he saw defendant's Ford Explorer parked on the side of the street. There was damage to the back of the vehicle. Puryear contacted an "apprehension team," which consisted of "undercover officers who are in unmarked vehicles" whose "primary job is to apprehend violent suspects." The team arrived and subsequently tailed the Explorer to defendant and G.G.'s apartment complex. Defendant and G.G. exited the vehicle, entered the building, and returned with beer. While they were "loitering" and "drinking beer" next to the SUV, they were taken into custody.

Officers searched defendant and G.G.'s apartment unit. In defendant's bedroom, they found "a short-barreled AR-15-style rifle"; "a bag of .223 ammunition"; a "grey knit" ski mask; and "black and white Nike shoes." Officers also searched defendant's Ford Explorer and found a jacket. The ammunition shared the same caliber, color, and brand as the shell casings recovered from the scene of the shooting and the apparel "closely matched" the clothing worn by the perpetrator in the surveillance footage. The firearm, ski mask, and jacket were analyzed for DNA: defendant could not be excluded as a potential contributor to any of the DNA profiles extracted.

G.G.'s phone was seized and examined. Location data from February 4, 2023, between 1:25 a.m. and 1:31 a.m. verified he left the apartment complex, headed toward the scene of the shooting, circled the gas station twice, stopped behind a nearby restaurant, and returned home. Phone records confirmed G.G. received a call from defendant at around 1:16 a.m.

5.

On February 15, 2023, Detective Clark of the Bakersfield Police Department—a rangemaster—test-fired defendant's AR-15. He observed the weapon, which could fire .223-caliber ammunition, was modified to become an "automatic weapon," i.e., "a machine gun." As a result, Clark was able to deplete a 13-round magazine with "one squeeze on the trigger." Comparing the markings of the spent shell casings at the range with those of the shell casings recovered from the scene of the shooting, he opined defendant's AR-15 was the murder weapon.

## II. Defense's case-in-chief

Defendant's wife A.L., who "separated from him for three years," testified defendant "is a respectable person" and "a very good father to the[ir] children."

Defendant's son M.L. testified defendant is "a very caring person, never aggressive or anything like that." M.L. acknowledged there was a physical altercation between defendant and A.L.'s boyfriend sometime in 2021. Police arrived and arrested only A.L.'s boyfriend. M.L. testified this incident would not change his opinion defendant is a nonviolent person, recalling A.L.'s boyfriend "would always like to start problems with [defendant] over jealousy."

## DISCUSSION

## I. The trial court did not abuse its discretion when it denied defendant's RJA motion.

### a. *Background*

Defendant moved in limine to "exclude the prosecutor and/or witnesses from referring to [defendant]'s United States legal status, including, but not limited to, whether he has a Social Security number." (Boldface & some capitalization omitted.) The trial court granted the motion.

At trial, Detective Perez of the Bakersfield Police Department testified he interviewed defendant. On cross-examination, defense counsel asked Perez if he "advised [defendant] that he had a very long [criminal] record." Perez could not

remember and asked to watch a video recording of the interview to refresh his recollection.  The court called for a brief recess.

Outside the presence of the jury, the following exchange occurred:

"THE COURT:  . . . [¶] . . . [¶]  I think I know where you're going.  I think your representation is the detective told your client, 'You have a long criminal record,' I do not know the exact words, and it turns out he does not have a criminal record. . . .  [¶] . . . [¶]  . . . So are you seeking this information from the detective to show your client has no record?

"[DEFENSE COUNSEL]:  No.  This is to show the officer's bias.

"THE COURT:  So you simply want to say you thought the defendant had had a criminal record and told him so, and then you're looking to show that he does not have a criminal record?

"[DEFENSE COUNSEL]:  I'm asking you to show – and again, I did not think we would get here, but I am asking to show that he not only said this to [defendant], he said this before checking with any database and then, because – and that's what shows bias.  He, in my opinion, assumed X, Y, and Z without double checking.  If he had double checked, then I don't know that that would have come out.

"THE COURT:  So if we can narrow this down, cue the video up, let the officer refresh his recollection. . . .  [M]y tentative would be to allow it, and then it would be one of those limited purpose situations.  Not necessarily for the truth of the matter, but to show the officer's bias towards defendant.  [¶] . . . [¶]  . . . I think that's the first – the first question is whether the witness's memory is refreshed. . . .  [¶]  . . . If the witness did say that to [defendant] about the criminal record, I think the next question is, was that statement – was he aware of whether there was a record or, not or did he just make that statement as an interview technique.

"If he says he believed he had a record, then I think you're in a position to prove the opposite to show some sort of bias.  If he says, 'No, I just – I just do that when I'm talking to people to get statements,' I do not know how much weight the other will have.  But that is up to you."

Perez subsequently watched a video recording of the interview.

After the jurors reentered the courtroom and cross-examination resumed, Perez testified he "indicated [defendant] had a long record after [defendant] advised [him] that

he had no record in the United States." On redirect examination, the following exchange occurred:

"Q. Detective, was there a reason why you thought he had a criminal record?

"A. Yes.

"Q. What was that?

"A. During my initial records check of him when he was initially identified as the registered owner of the vehicle, I located previous police reports for crimes that had been investigated where he was identified. I also contacted our records division where we run a RAP sheet for criminal history. Our records division clerks had access to conduct those RAP sheet searches by name, by birthdate, by driver's license, and by Social Security number. In this particular incident, I requested a RAP sheet be searched. There was difficulty locating an exact match based on the fact that he did not have a Social Security number.

"[DEFENSE COUNSEL]: Objection, Your Honor. Motion in Limine violation.

"THE COURT: Sustained only as to that one sentence.

"[DEFENSE COUNSEL]: Move to strike.

"THE COURT: Just the one sentence there was difficulty. [¶] You can continue if you were not finished.

"THE WITNESS: There was a person located by the name and close birthdate to [defendant's name], who had a criminal record during that search. I was advised of those details of the RAP sheet, which I believed was the defendant."

Defendant filed an RJA motion, citing section 745, subdivision (a)(1). He argued:

"Here, Lead Detective Perez, was questioned by the [d]efense on cross examination regarding his accusation of [defendant] having a 'very long [criminal] record' when in fact [defendant] has none. Once back on direct examination, Detective Perez clarified that [defendant] did not have a criminal record in the United States and simultaneously implied that he did have a criminal record outside of the United States. Additionally, Detective Perez testified that [defendant] did not have a social security number.

8.

Detective Perez's unnecessary comment implied that [defendant]'s lack of criminal history in the United States has nothing more to do than with the fact that he is an illegal immigrant.  It also implies that because he is undocumented that he likely has 'a very long [criminal] history' in his home country of Mexico.  Detective Perez's testimony implies that [defendant] was lying based on nothing more than his ethnicity and/or national origin."  (Italics omitted.)

The trial court determined defendant made a prima facie showing and held a hearing.  Following counsels' arguments, the court denied the motion.  It explained:

"In further dissecting the language of [section 754, subdivision] (a)(1), I'm looking at what counsel alleges to have been the basis for that by Detective mentioning, in response to a question, that they couldn't find an exact match based on the fact that he did not have a Social Security number.  I think that is probably, not to make defense argument, but I don't think that is a racial or ethnic indication.

"Based on the argument [defense counsel] made in the prior motion that the lack of a Social Security number is associated with a person – could be associated with a person who is in this country illegally, I'm going to assume that you are expressing that you feel the detective was biased or exhibiting bias based on defendant's national origin.

"Then it does go back to some of the argument that we had before, which is making an assumption that lack of Social Security number indicates someone is here illegally and is indicating the detective is introducing some sort of bias towards defendant based on that.  Bias, I guess, because he is not from this country.  Bias – I think that is the argument being made, and I'm just struggling because I am not seeing the evidence to support it, intentionally or not intentionally.

"I am not seeing where this testimony is showing that Detective Perez is biased.  I'm seeing that he answered – he was – his credibility was being attacked because he accused [defendant] of having a long record.  What never was proved, but what I'm assuming is true, is that defendant does not have a criminal record.

"So it was almost an accusation of you are accusing someone with no criminal record of having a criminal record to show Detective Perez was somehow lying.  But it turns out that he was allowed to explain on direct why he said that.  And we had even speculated in chambers I think maybe he did that – maybe a detective does that because he is trying to rile up the defendant or ruse – use a ruse to get him to admit to something.  But in this

9.

case, the detective explained that he had contacted his records division. And then he went on to explain how they do their search and what he was provided, and how what he was provided may have been faulty and that's why – he was provided something showing a person with a long criminal history and he believed it was the defendant.

"So his response is saying, 'Well, I did think he had a criminal record,' although we just never went that far. That is what that response was.

"So I don't think that response shows some sort of implicit or explicit bias against the defendant's nationality, or his race, or his ethnicity. That statement was an attempt to explain why he said what he said to the defendant.

"And again, it's a bit of a stretch. We don't have any information if whether not having a Social Security number means that you are here without legal permission. So even stretching to try to see if there was some sort of implicit bias in Detective Perez's response, I don't think you have met that burden of preponderance of evidence."

b. *Pertinent law*

"Effective January 1, 2021, the [RJA], which is codified in a scheme of interrelated statutes in the Penal Code (§§ 745, 1473, subd. (f), 1473.7, subd. (a)(3)), states that '[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin.' (§ 745, subd. (a).)" (*Young v. Superior Court* (2022) 79 Cal.App.5th 138, 147.) " 'The express purpose of the [RJA] is "to eliminate racial bias from California's criminal justice system because racism in any form or amount, at any stage of a criminal trial, is intolerable [and] inimical to a fair criminal justice system . . . ." [Citation.]' [Citation.]" (*People v. Howard* (2024) 104 Cal.App.5th 625, 648 (*Howard*).)

The RJA "sets forth four categories of conduct, any of which, if proved [by a preponderance of the evidence], is enough to 'establish' a violation of section 745, subdivision (a)." (*Young v. Superior Court*, *supra*, 79 Cal.App.5th at p. 147; see § 745, subd. (a)(1)–(4).) In the instant case, defendant expressly relied upon section 745,

10.

subdivision (a)(1), which reads:  "The judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin."

"Procedurally, a defendant may file a motion in the trial court alleging a violation of section 745, subdivision (a)."  (*Howard*, *supra*, 104 Cal.App.5th at p. 649.)  "If a motion is filed in the trial court and the defendant makes a prima facie showing of a violation of subdivision (a), the trial court shall hold a hearing."  (§ 745, subd. (c); see *id.*, subd. (h)(2) [" 'Prima facie showing' means that the defendant produces facts that, if true, establish that there is a substantial likelihood that a violation of subdivision (a) occurred. For purposes of this section, a 'substantial likelihood' requires more than a mere possibility, but less than a standard of more likely than not."]; see also *Sanchez v. Superior Court* (2024) 106 Cal.App.5th 617, 629, fn. 4 ["[T]he threshold for establishing the right to an investigation and evidentiary hearing on an RJA claim is low, and may be satisfied even if . . . there was clearly a permissible and race-neutral purpose for the statements in question."].)  At the hearing, evidence may be presented by either party. (§ 745, subd. (c)(1).)  The defendant "shall have the burden of proving a violation of subdivision (a) by a preponderance of the evidence" (*id.*, subd. (c)(2)) but "does not need to prove intentional discrimination" (*ibid.*).

   c.  *Standard of review*

A trial court's findings at the conclusion of an evidentiary hearing on an RJA motion are reviewed for an abuse of discretion.  (*Howard*, *supra*, 104 Cal.App.5th at p. 651.)  " 'Under the abuse of discretion standard, "a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' [Citations.]"  (*People v. Lewis* (2009) 46 Cal.4th 1255, 1286.)  In other words, "[a] court abuses its discretion when its ruling 'falls outside the bounds of reason.' [Citation.]"  (*People v. Kipp* (1998) 18 Cal.4th 349, 371; see

*People v. Brown* (2004) 33 Cal.4th 892, 901 [" ' "No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for the wrong reason." ' "].)

    d. *Analysis*

    On appeal, defendant contends he "proved by a preponderance of the evidence that Detective Perez exhibited bias against [him] based on [his] national origin when Detective Perez testified, in violation of a prior court order, that [he] did not have a Social Security number." (Boldface omitted.)

    Detective Perez interviewed defendant. At trial, on cross-examination, defense counsel asked Perez if he "advised [defendant] that he had a very long [criminal] record." When Perez could not remember and asked to watch a video recording of the interview to refresh his recollection, the court called for a brief recess. During said recess, the court inquired about the purpose of the question. Defense counsel specified she sought to demonstrate Perez was biased and simply assumed defendant had a criminal record "before checking with any database." Perez then watched the video recording of the interview. After the recess ended and cross-examination resumed, Perez testified he "indicated [defendant] had a long record after [defendant] advised [him] that he had no record in the United States." On redirect examination, the prosecution asked Perez to explain why he thought defendant had a record. Perez testified he contacted the police department's records division—which could access RAP sheets by name, birthdate, driver's license, and/or social security number—and requested a search. When he pointed out "[t]here was difficulty locating an exact match based on the fact that [defendant] did not have a Social Security number," defense counsel objected on the basis of the in limine motion. The court sustained the objection and struck the remark. Thereafter, Perez testified the records division was able to find a person with defendant's name and a similar birthdate, which informed his belief defendant actually had a record.

12.

In finding defendant did not prove a violation of section 745, subdivision (a)(1) by a preponderance of the evidence and denying the RJA motion, the trial court evaluated Perez's testimony in its proper context. His statements on redirect examination attempted to rebut defense counsel's suggestion he did not "check[] with any database" to confirm defendant had a criminal record before confronting him with the fact. Perez mentioned defendant did not have a social security number to explain why the records division could not obtain an "exact match" and instead accessed the RAP sheet of someone who shared defendant's name and had a similar birthdate. It was not " 'outside the bounds of reason' " (*People v. Kipp*, *supra*, 18 Cal.4th at p. 371) for the court to conclude Perez's reference to defendant's lack of a social security number was for a permissible, race-neutral purpose rather than a portent of "bias or animus towards the defendant because of [his] race, ethnicity, or national origin" (§ 745, subd. (a)(1)). Therefore, we conclude the court did not exercise its discretion in an arbitrary, capricious, or patently absurd manner when it denied defendant's RJA motion. (See *People v. Lewis*, *supra*, 46 Cal.4th at p. 1286.)

## DISPOSITION

The judgment is affirmed.

                                                          DETJEN, Acting P. J.

WE CONCUR:

FRANSON, J.

DE SANTOS, J.

13.