Filed 3/4/26  P. v. Ness CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

|  |  |
|---|---|
| THE PEOPLE | B337842 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA117461) |
| v. | |
| MICHAEL IRVING NESS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joan M. Chrostek, Judge.  Affirmed.

Nicholas Seymour, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Zee Rodriguez and Lauren Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

Michael Irving Ness shot and killed his roommate, Ray Bonilla. The People charged Ness with first-degree premeditated, willful, and deliberate murder. Ness asked jurors to consider a manslaughter conviction premised, in part, on the killing being in the heat of passion. The jury rejected both first-degree murder and manslaughter, instead convicting Ness of second-degree murder.

Seeking reversal of his conviction, Ness argues: (1) his trial counsel should have objected to the prosecutor's misstatements of the law regarding heat-of-passion voluntary manslaughter; (2) the form jury instruction on that theory, CALCRIM No. 570, was inadequate in light of the prosecutor's misstatements; (3) the trial court should have instructed the jury on involuntary manslaughter arising from unconsciousness due to voluntary intoxication; and (4) the cumulative prejudice from these errors requires reversal. We affirm.

## BACKGROUND

Ness moved in with Bonilla in October 2017. Their relationship soon deteriorated. Ness, who testified at trial, believed his girlfriend and Bonilla were having, and concealing from him, an affair. On a few occasions, Ness testified, Bonilla partied with women in his bedroom, keeping Ness awake at night. The hostility between Ness and Bonilla permeates their frequent text messages, as well as Ness's texts to others, some of which contain veiled and not so veiled threats from Ness directed toward Bonilla. As will become relevant, Ness kept a revolver in his closet. He normally would not take his gun when leaving the house.

2

One afternoon, about four months after Ness moved in with Bonilla, Ness hosted Gustavo Rodgers, a neighbor from across the street, for a drink. A short while later, Bonilla came home and began cooking dinner on the stove nearby. Rodgers immediately felt tension between Bonilla and Ness, observing that although Bonilla greeted Rodgers, he said nothing to Ness. According to Rodgers, Ness and Bonilla exchanged dirty looks, and Ness angrily pounded the kitchen table where he sat a couple of times with a bottle of alcohol. Rodgers went home when his wife called and told him dinner was ready. When he left, Bonilla was still cooking at the stove, and Ness was still sitting at the kitchen table.

Ness testified that upon Rodger's departure, he said to Bonilla: " 'You sure get bored easy, don't you?' " Ness explained at trial that he meant this needling "dig" to inform Bonilla that he had overhead Bonilla's phone conversation from the night before, during which Bonilla had said: " 'I'm bored. Would you like to come over?' " At this time, Ness was not carrying his gun.

According to Ness, Bonilla "went ballistic" in response to his comment and yelled at him. Ness told Bonilla to "tone it down" because "the neighbors don't need to hear [their] personal stuff." Bonilla then yelled at him again and threw something at him. Immediately thereafter, Ness testified, Bonilla grabbed Ness and threw him to the ground. Ness said he was "knocked unconscious" and did not remember what happened in the following moments.

The next thing Ness did remember was walking outside toward Rodgers's house and seeing Bonilla sitting in Bonilla's car. According to Ness, the doors were closed and the windows were up. Ness's revolver was now in his waistband.

As Ness approached Bonilla's car, he heard Bonilla "yelling about a gun" and saw light from Bonilla's cell phone. Rodgers, meanwhile, testified to being on the phone with Bonilla after he had returned home, and that Bonilla said Ness was "acting crazy" and "has a gun." Rodgers then immediately heard gunshots. Ness admitted firing his gun "a few times" through the car window.

Ness's next memory was of walking on the street. Ness testified he was trying to go home but soon realized he was walking in the wrong direction. He eventually made his way to a bar next to his home, where he was later arrested by police. The police recovered a gun from Ness's waistband.

The People charged Ness with first-degree murder. (Pen. Code, § 187, subd. (a).) The operative first amended information alleged numerous firearm-related enhancements in connection with Ness's commission of the crime. (*Id.*, § 12022.53, subds. (b)−(d).)

At trial, Ness, in accord with the testimony we have recounted, conceded he killed Bonilla. But he asserted the People failed to prove he killed willfully with premeditation and deliberation as required for first-degree murder. He further argued the jury should consider finding him guilty of voluntary manslaughter, rather than any degree of murder, as he killed in imperfect self-defense or in the heat of passion.

The jury found Ness guilty of second-degree murder and found true the sentence-enhancing allegations of firearm use, including the allegation, under Penal Code section 12022.53, subdivision (d), that Ness personally and intentionally discharged a firearm in killing Bonilla. The trial court imposed a sentence to 40 years to life in state prison, consisting of a term of 15 years to

4

life for the murder and a consecutive term of 25 years to life for the firearm use.

Ness timely appealed.

## DISCUSSION

## A. Prosecutorial Misconduct

Viewing the prosecutor's arguments regarding heat-of-passion voluntary manslaughter in context, there was no misconduct, so Ness cannot succeed on a claim of ineffective assistance of counsel based on trial counsel's failure to object to those arguments.

### 1. The Law of Murder and Manslaughter

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (Pen. Code, § 187, subd. (a).) "Manslaughter is the unlawful killing of a human being without malice" (*id.*, § 192) and "is a lesser included offense of murder." (*People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*).)

"Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' [Citation.] Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation." (*Beltran, supra*, 56 Cal.4th at p. 942, fn. omitted.)

5

When asking whether provocation can give rise to heat of passion and reduce murder to manslaughter, the relevant inquiry is *not* whether the provocation was "of a kind that would cause an ordinary person of average disposition *to kill.*" (*Beltran, supra,* 56 Cal.4th at p. 938.)  Instead, "[p]rovocation is adequate only when it would render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than judgment.' " (*Id.* at p. 957.)

## 2.    Additional Background

The trial court instructed the jury on heat-of-passion voluntary manslaughter with CALCRIM No. 570.  During closing argument, Ness's counsel read jurors the instruction's language and argued the essential elements of this offense, not murder, had been met.  Counsel stated:  "So what do we have in this case?  We have a fight . . . where my client gets knocked out.  So in this case if my client reacted to that fight, and we know it happened within minutes and he reacted based on that fight.  And he was upset and he shoots Mr. Bonilla based on that reaction.  That's also called heat of passion and it's voluntary manslaughter."

The prosecutor, in rebuttal, responded that an objective standard governs whether the provocation was sufficient to reduce murder to manslaughter.  She argued:  "For heat of passion to apply the defendant has – means the defendant was sufficiently provoked by the victim.  Sufficient, what does that mean?  That means that an ordinary person would have acted rashly or without due deliberation and reflection.  An ordinary person would have reacted the same way that Mr. Ness did.  This is based on the fact that – or not the fact.  This is based on the argument that there was a fight that occurred in that house.  And for you to believe this, you would have to find that an

6

ordinary person would have done and acted and reacted the way that Mr. Ness did to the fight that he described in that house. If an ordinary person of average disposition would not have acted rashly without due deliberation in that circumstance, it's not heat of passion. It says the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment. The defendant is not allowed to set up his own standard of conduct. What that means is the defendant can't come in here and say, well I acted this way. I reacted this way so it's heat of passion. That is what comes back to the ordinary person. An ordinary person would have reacted the same way. And if you don't find that to be true, it's not heat of passion. Heat of passion is that the decision was based on passion and not judgment. But it can never, never be based on revenge or punishment."

While deliberating, the jury asked the trial court two questions relating to provocation. First, it asked: "Can the judge give us clarification/definition of provocation? [¶] How does provocation relate to murder 2?" In response, the court directed the jury to carefully review CALCRIM Nos. 522[1] and 570, which jurors had in writing, and explained that CALCRIM No. 570 "has the definition of provocation."

The next day, the jury asked: "Would you please clarify that the definition as outlined on [CALCRIM No.] 570 applies to murder 1 & 2 specifically 'In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have

---

[1] CALCRIM No. 522, also given to jurors in this case, explains that provocation may reduce murder from first degree to second degree and may reduce murder to manslaughter.

reacted from passion rather than judgment.' "  Based on this question, the trial court noted the jury "seemed confused," as it was "using the standard put forth in [CALCRIM No. 570 for] voluntary manslaughter and applying it to [decide between] murder 1 and murder 2, which is not appropriate."  Finding the confusion unlikely to be resolved by further directions referring the jury to the instructions, the court permitted counsel to address the matter by further argument.

The prosecutor began her supplemental argument by stating CALCRIM No. 570 "is the heat of passion instruction for voluntary manslaughter," which applies only when there is "sufficient provocation."  As to this standard, she stated:  "So as you know, sufficient provocation means that a person of average disposition, in the same situation and knowing the same set of facts would have reacted from passion rather than judgment. To start off with that, if you think that Mr. Ness or that the way that Mr. Ness acted in this case that an average person or ordinary person of average disposition would not have reacted from passion, then that instruction doesn't apply and you're back to first degree murder or second degree murder, okay? Provocation can affect those in different ways."

Later, in addressing how provocation can reduce second-degree murder to voluntary manslaughter, the prosecutor stated: "So reduce second degree murder to voluntary manslaughter, the provocation must be so great that it would have caused an ordinary person of average disposition to act rationally [*sic*] and without due deliberation.  So passion rather than judgment.  As I said, if you do not believe that an ordinary person of average disposition would have acted rationally without due deliberation in that circumstance, that instruction does not apply.  You do not

8

have heat of passion.  You do not have voluntary manslaughter. Now you're back to murder one, murder two."  Shortly thereafter, the prosecutor stated:  "So again, when you are deliberating and talking about this standard, this ordinary person standard, if you have determined that an ordinary person would not have acted this way, that instruction is gone.  It is not manslaughter, okay?"

Ness's counsel then addressed the jurors on the interplay between murder, manslaughter, and provocation.  Regarding provocation, counsel, too, pointed jurors toward CALCRIM No. 570 and told jurors the fight with Bonilla was "enough provocation for my client to react."  He continued:  "[A]s long as [Ness was] under the stress of the fight, heat of passion applies."

The prosecutor's final, brief remarks to the jury included the following:  "It is an ordinary person standard for heat of passion.  So the question is, was it sufficient provocation to cause a person of average disposition to act based on passion, not judgment.  If the answer to that is no, there is no heat of passion, okay."

### 3.    Analysis

Ness concedes his trial counsel raised no objections during the prosecutor's closing and supplemental arguments, thus forfeiting any claim of prosecutorial misconduct arising therefrom.  (*People v. Linton* (2013) 56 Cal.4th 1146, 1205 [" 'To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument' "].)  Ness instead asserts reversal is required because his counsel rendered ineffective assistance by failing to object to the prosecutor's remarks that, in his view, misled the jury into believing, despite the contrary holding of *Beltran* discussed

9

above, that "heat of passion voluntary manslaughter requires provocation sufficient to drive the average person to kill."

" 'A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 674 (*Centeno*).) To prevail on an ineffective assistance of counsel claim, Ness must "show[ ] by a preponderance of the evidence that (1) counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficiencies resulted in prejudice." (*Ibid.*)

We reject Ness's claim because, as discussed below, the prosecutor's remarks, in context, were not misconduct. Since there was no misconduct warranting a meritorious objection, the performance by Ness's counsel was not deficient. (See *People v. Kipp* (1998) 18 Cal.4th 349, 377 (*Kipp*) [failure to raise a meritless argument is not ineffective assistance of counsel].)

"Advocates are given significant leeway in discussing the legal and factual merits of a case during argument. [Citation.] However, 'it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements [citation].' [Citations.] To establish such error, bad faith on the prosecutor's part is not required." (*Centeno*, *supra*, 60 Cal.4th at pp. 666−667.)

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of

10

comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' " (*Centeno*, *supra*, 60 Cal.4th at p. 667.)

Ness points to several statements from the prosecutor's rebuttal and supplemental arguments to support his position that the prosecutor misstated the law of provocation. Specifically, Ness asserts the prosecutor inappropriately argued, in her rebuttal, that to find the provocation sufficient, the jury had to find that "[a]n ordinary person *would have reacted the same way that Mr. Ness did*[,]" that "an ordinary person would have *done and acted and reacted the way that Mr. Ness did to the fight* that was described in that house[,]" and that "an ordinary person would have reacted *the same way*." (Italics added.) Ness also takes issue with the prosecutor's argument during her supplemental argument that: "So again, when you are deliberating and you're talking about this standard, this ordinary person standard, *if you have determined that an ordinary person would not have acted this way, that instruction is gone.* It is not manslaughter, okay?" (Italics added.) To Ness, these remarks improperly implied that provocation only converts murder to manslaughter if it would have driven an ordinary person to kill.

Viewed in isolation, the challenged remarks admit of some ambiguity. They could be construed as suggesting that to find Ness guilty of heat-of-passion voluntary manslaughter, the jury needed to find an ordinary person would have — as Ness asserted he had — reacted from passion and without deliberation or judgment, in response to the fight with Bonilla. Alternatively, the comments could be interpreted as implying that the jury

11

needed to find an ordinary person would have — again, as Ness did in this case — reacted by shooting and killing Bonilla in response to the fight.

But we do not view a prosecutor's comments in isolation when discerning whether they constitute misconduct. (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 513.) We consider them " '[i]n the context of the whole argument and the instructions' " to ascertain whether "there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*Centeno*, *supra*, 60 Cal.4th at p. 667.) Further, "we do ' "not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." ' " (*People v. Cortez* (2016) 63 Cal.4th 101, 131.)

Applying these principles, we are persuaded there is no reasonable likelihood that the jury misapplied the challenged comments in the manner Ness contends. The prosecutor's remarks surrounding the disputed comments, along with the instructions given and reiterated, dispelled their ambiguity and directed the jury to apply the correct standard when evaluating the sufficiency of the provocation required for manslaughter.

We repeat the prosecutor's rebuttal closing argument, again showing the challenged remarks in italics but now bolding remarks that correctly stated provocation law. "For heat of passion to apply the defendant has – means the defendant was sufficiently provoked by the victim. Sufficient, what does that mean? **That means that an ordinary person of average disposition would have acted rashly or without due deliberation and reflection**. *An ordinary person would have*

12

*reacted the same way that Mr. Ness did*. This is based on the fact that – or not the fact. This is based on the argument that there was a fight that occurred in that house. And for you to believe this, *you would have to find that an ordinary person would have done and acted and reacted the way that Mr. Ness did to the fight that he described in that house*. **If an ordinary person of average disposition would not have acted rashly without due deliberation in that circumstance, it's not heat of passion**. It says **the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment.** The defendant is not allowed to set up his own standard of conduct. What that means is the defendant can't come in here and say, well, I acted this way. I reacted this way so it's heat of passion. That is what comes back to the ordinary person. *An ordinary person would have reacted the same way.* And if you don't find that to be true, it is not heat of passion. **Heat of passion is that the decision was based on passion and not judgment.**" (Italics and bolded text added.)

Each challenged comment was immediately preceded and followed by a correct statement of law. The prosecutor's repeated and consistent references to the correct standard for provocation informed the jury's interpretation of the remarks in question. On the whole, then, the prosecutor's rebuttal argument directed the jury that, in deciding whether the provocation was sufficient, it had to determine whether an ordinary person would have acted rashly from passion, not whether an ordinary person would kill.

Even if some ambiguity remained, the trial court essentially hit the reset button on provocation after jurors asked two questions on the subject. It directed jurors back to CALCRIM No. 570. And then it invited new argument at which

13

the parties' remarks were more clear. The prosecutor opened her supplemental remarks by referencing CALCRIM No. 570 and correctly stating the law on provocation *twice*. First, she stated: "**So, as you know, sufficient provocation means that a person of average disposition, in the same situation and knowing the same set of facts would have reacted from passion rather than judgment.** To start off with that, if you think that Mr. Ness or the way that Mr. Ness acted in this case **that an average person or ordinary person of average disposition would not have reacted from passion, then that instruction doesn't apply** and you're back to first degree murder or second degree murder, okay?" (Bolded text added.) Then, after briefly explaining how provocation can reduce murder from first degree to second degree, the prosecutor continued: "So reduce second degree murder to voluntary manslaughter, **the provocation must be so great that it would have caused an ordinary person of average disposition to act rationally [*sic*] and without due deliberation. So passion rather than judgment. As I said, if you do not believe that an ordinary person of average disposition would have acted rationally without due deliberation in that circumstance, that instruction does not apply.** You do not have heat of passion. You do not have voluntary manslaughter. Now you're back to murder one, murder two." (Bolded text added.)

Toward the end of her supplemental argument, the prosecutor referenced her earlier, correct statement of provocation law before speaking the final remark Ness challenges: "**So again**, when you are deliberating and you are talking about **this standard, this ordinary person standard**, *if you have determined that an ordinary person would not have*

14

*acted this way, that instruction is gone.* It is not manslaughter, okay?" (Italics and bolded text added.)

Subsequently, in rebutting Ness's supplemental argument, which offered no misstatement of note, and providing the final argument on the topic to the jury, the prosecutor correctly stated: "It is an ordinary person standard for heat of passion. **So the question is, was it sufficient provocation to cause a person of average disposition to act based on passion, not judgment.** If the answer to that is no, there is no heat of passion, okay." (Bolded text added.)

With these repeated statements articulating the proper standard for evaluating the sufficiency of provocation for heat-of-passion voluntary manslaughter, the jury was not reasonably likely to construe the prosecutor's remark, italicized just above, as an invitation to apply a standard contrary to *Beltran.*

In addition to viewing the challenged comments in the context of the prosecutor's argument as a whole, we also consider the jury instructions. (*Centeno, supra,* 60 Cal.4th at p. 667.) As noted above, the court gave and redirected the jury to CALCRIM No. 570, which correctly sets forth the objective standard for evaluating the sufficiency of provocation required for heat-of-passion voluntary manslaughter.[2] The court also gave CALCRIM No. 520, which states, in relevant part: "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." Presuming "that the jury relied on the instructions, not the arguments, in convicting" Ness (*People v. Morales* (2001) 25 Cal.4th 34, 47), we

---

[2]     To the extent Ness argues CALCRIM No. 570 was ambiguous, we address that in part B.2, *post.*

15

conclude it is not reasonably likely that the jury misapplied the challenged comments to find provocation sufficient only if it would drive an ordinary person to kill.

In sum, Ness has not "show[n] that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.'" (*Centeno, supra*, 60 Cal.4th at p. 667.) Accordingly, the comments did not constitute prosecutorial misconduct, and Ness's trial counsel's performance was not deficient based on his failure to object. Reversal is not required. (See *id.* at p. 674; see also *Kipp, supra*, 18 Cal.4th at p. 377.)

## B.     Instructional Error – CALCRIM No. 570

Ness, expanding on his assertion of prosecutorial misconduct, argues the prosecutor's arguments regarding heat-of-passion voluntary manslaughter rendered CALCRIM No. 570 ambiguous, such that its use without further clarification by the trial court constituted prejudicial error. According to Ness, "the prosecution argued that the instruction should be interpreted in a manner inconsistent with the law, and no further instruction was given to dispel the jurors of that impression."

### 1.     Forfeiture

As with his claim of prosecutorial misconduct, Ness concedes his trial counsel did not object to CALCRIM No. 570's wording or seek a pinpoint instruction clarifying its application. Nonetheless, Ness asserts he has not forfeited his instructional error claim because a trial court must instruct on the law correctly and its error affected his substantial rights. (See Pen. Code, § 1259.)

16

Ness is correct that "[i]n general, a defendant may raise for the first time on appeal an instructional error affecting his or her substantial rights. [Citations.] But '[a] party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial.'" (*People v. Buenrostro* (2018) 6 Cal.5th 367, 428; cf. *People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7 [under Penal Code section 1259, defendant need not preserve by timely objection in the trial court his claim that an instruction incorrectly stating the law violated his right to due process].) Here, Ness does not contend CALCRIM No. 570 misstated the law. His assertion is that CALCRIM No. 570 was too general, susceptible to more than one interpretation following counsels' closing and supplemental arguments, such that further clarification was warranted by the trial court. Under these circumstances, Ness "was obligated to request a clarifying instruction and failed to do so, thereby forfeiting h[is] appellate challenge." (*People v. Buenrostro*, at p. 428.)

### 2. Ineffective Assistance of Counsel

Having concluded Ness forfeited his instructional error claim, we consider his argument that reversal is required because his trial counsel rendered ineffective assistance by failing to request a pinpoint instruction clarifying CALCRIM No. 570's application. Again, to prevail on his ineffective assistance of counsel claim, Ness must demonstrate: (1) his trial counsel's performance was deficient; and (2) counsel's deficiencies resulted in prejudice. (*Centeno, supra*, 60 Cal.4th at p. 674.)

Ness's claim fails because CALCRIM No. 570 is not ambiguous and the prosecutor's arguments did not implore the jury to apply the instruction in a manner inconsistent with law.

Consequently, no clarifying instructions were required. (See *Kipp*, *supra*, 18 Cal.4th at p. 377.)

*Beltran* forecloses a claim that CALCRIM No. 570 is ambiguous. In that case, the trial court gave the 2006 version of CALCRIM No. 570 (*Beltran*, *supra*, 56 Cal.4th at p. 943), which was similar to the instruction here but told the jury that " '[i]n deciding whether the provocation was sufficient, consider whether a person of average disposition would have been provoked and *how such a person would react in the same situation knowing the same facts*.' " (*Id*. at p. 954, italics added.) Our Supreme Court found this instruction unambiguous, explaining: "[T]he court instructed that the heat of passion principle came into play if defendant acted under the influence of intense emotion that obscured his reasoning or judgment. Telling the jury to consider how a person of average disposition 'would react' properly draws the jury's attention to the objective nature of the standard and the effect the provocation would have on such person's state of mind." (*Ibid*, fn. omitted.)

Here, the trial court gave a revised version of CALCRIM No. 570, which instead instructed the jury that "[i]n deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, *would have reacted from passion rather than from judgment*." (Italics added.) Consequently, unlike the 2006 version, which asked "how" a reasonable person would react in the same situation, the instruction in this case asked "whether" that person "would have reacted from passion rather than judgment." The revised instruction is clearer and highlights *Beltran*'s key emphasis on reactions arising "from passion rather than from judgment." (See *Beltran*, *supra*, 56 Cal.4th at pp. 939,

18

954, fn. 14.) As our Supreme Court has held even the older and vaguer version of CALCRIM No. 570 was unambiguous (*id.* at p. 954), we cannot fault the more specific version given here.

Ness's instructional error argument relies on — indeed, it expressly incorporates by reference — his prior contention that the prosecutor's arguments misstated the law on provocation and directed the jury to apply CALCRIM No. 570 in a manner violative of *Beltran*. We addressed this point in part A.3, *ante*. In short, when viewed in context, the complained-of comments did not direct the jury to evaluate provocation based on whether a person of ordinary disposition would have killed in response to Ness's altercation with Bonilla.

*Beltran*, to be sure, recognized the possibility that the parties' arguments could sometimes "mudd[y] the waters" and "confuse[ ] the jury's understanding" of correct instructions. (See *Beltran*, *supra*, 56 Cal.4th at pp. 954–955.) But *Beltran* did not reach that conclusion on its own facts, and those facts are distinguishable in any event. There, "the prosecutor's closing argument," in language different from what the prosecutor used here, " 'used the examples of stubbing a toe, getting cut off in traffic, or being jealous to argue that minor provocation is not sufficient to cause a reasonable person *to kill someone.*' " (*Id.* at p. 955, italics added; cf. *People v. Najera* (2006) 138 Cal.App.4th 212, 224 [taking issue with a prosecutor stating: " 'Would a reasonable person be so aroused as to kill somebody? That's the standard' "].) Though these remarks "may" have confused jurors (*Beltran*, at p. 955), *Beltran* ultimately determined, based on the circumstances at hand, "it was not reasonably probable that any possible ambiguity engendered by counsel's argument misled the jury." (*Id.* at p. 956.)

19

In sum, Ness has not demonstrated his trial counsel's performance was deficient based on his failure to object to the wording of CALCRIM No. 570. Ness has accordingly failed to establish ineffective assistance of counsel. (See *Centeno*, *supra*, 60 Cal.4th at p. 674; see also *Kipp*, *supra*, 18 Cal.4th at p. 377.)

## C. Instructional Error – CALCRIM No. 626

The trial court did not err in withholding a jury instruction on involuntary manslaughter based on an unconscious killing.

"When a person renders himself or herself unconscious through voluntary intoxication and kills in that state, the killing is attributed to his or her negligence in self-intoxicating to that point, and is treated as involuntary manslaughter." (*People v. Ochoa* (1998) 19 Cal.4th 353, 423.) "Unconsciousness for this purpose need not mean that the actor lies still and unresponsive . . . ." (*Ibid.*) Instead, "unconsciousness ' "can exist . . . where the subject physically acts in fact but is not, at the time, conscious of acting." ' " (*Id.* at p. 424.)

CALCRIM No. 626 instructs on this theory of involuntary manslaughter. (CALCRIM No. 626.) Over Ness's objection, the trial court refused to give CALCRIM No. 626, agreeing with the People that insufficient evidence warranted the instruction. Asserting this ruling was prejudicial error, Ness argues his statements to police following his arrest and the testimony of his expert, Dr. Ryan O'Connor, were substantial evidence showing that, when he shot Bonilla, he was unconscious due to voluntary intoxication.

We disagree. Although " ' "the trial court must instruct on the general principles of law relevant to the issues raised by the evidence," ' " including "all theories of a lesser included offense which find substantial support in the evidence," there is no such

obligation to instruct when that evidentiary support is lacking. (*People v. Breverman* (1998) 19 Cal.4th 142, 154, 162 (*Breverman*).) Reviewing the question de novo and viewing the evidence in the light most favorable to defendant (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137), we conclude the trial evidence did not support an unconscious killing of any sort.

The evidence Ness cites could support that he was drunk at the time of the shooting, that he had spotty memory of some events occurring after Bonilla threw him to the ground, and that alcohol consumption could have caused this memory loss. None of this evidence, however, demonstrates he was unaware of his actions when he shot Bonilla. Instead, uncontradicted evidence bearing upon Ness's state of mind in the moments before, during, and after the shooting shows he was conscious of his actions and understood their consequences.

As to his state of intoxication, Ness testified he had been drinking throughout the day and had more than one glass of vodka while drinking with Rodgers. Ness testified that as he was walking toward Rodgers's home after his fight with Bonilla, just moments before the shooting, he "was blitzed" and "wasn't feeling any pain . . . ." Ness then clarified, however, that "[a]t that moment . . . [he] still knew what was going on." Therefore, per his own trial testimony, Ness was under the influence of alcohol yet remained aware of his actions at the time of the shooting. Further, in a police interview introduced into evidence, Ness told officers he "remember[ed] firing" his gun into Bonilla's car and that he was "not going to lie about that."

Contrary to Ness's argument, Dr. O'Connor did not undermine Ness's testimony by "linking [his] unconsciousness with his intoxication." Called to testify on Ness's behalf, Dr.

21

O'Connor is an emergency medical physician and a forensic medical expert.  At trial, Dr. O'Connor explained the concepts of post-traumatic amnesia and alcohol-induced blackout, also known as alcohol-related amnesia.

Post-traumatic amnesia, Dr. O'Connor explained, "is a state of derangement of brain function that can occur after a head injury[,]" in which "the brain can have difficulty forming new memories for a period of time . . . ."  This condition "can occur with or without a loss of consciousness" and "can last for minutes or hours or even days depending on the severity of the head injury."  Alcohol-induced blackout, Dr. O'Connor testified, "is a somewhat similar concept[,]" as it is likewise characterized by "a disruption in memory formation."  According to Dr. O'Connor: "Alcohol, especially in high doses [and] especially when the alcohol level increases very quickly can disrupt th[e] process of encoding . . . [and] transferring short term memory to long term memory.  So people that drink a lot of alcohol very quickly, like chronic alcoholics for example, can experience alcohol related amnesia or a blackout where they don't recall a specific period of time because of the influence of alcohol on their brain."

Ness's counsel presented Dr. O'Connor with a hypothetical based on Ness's testimony regarding his drinking on the date of the shooting, his fight with Bonilla and the resulting injury to his head, and the memory loss Ness experienced thereafter.  On those facts, Dr. O'Connor opined that the memory loss Ness described was "plausible" and may have been "trigger[ed] . . . [by] heavy alcohol use and also head trauma."

Notably, Dr. O'Connor did not opine whether Ness was aware of his actions when he shot Bonilla.  He only testified it was plausible that Ness experienced the memory loss described

22

in his testimony due to his alcohol consumption and/or the closed head injury he sustained during the fight. Similarly, in his police interview, Ness did not state he lacked consciousness of his actions at the time of the shooting. He told the police that he knew he was the one who "went outside" after Bonilla and could not claim self-defense. He saw Bonilla in his car, and "in his mind at the time it was still an ongoing fight and [he] really [didn't] remember what transpired."

However, "[d]efendant's . . . inability to recall [an] event, without more, [is] insufficient to warrant an unconsciousness instruction." (*People v. Rogers* (2006) 39 Cal.4th 826, 888; *People v. Halvorsen* (2007) 42 Cal.4th 379, 418 (*Halvorsen*) ["That [the defendant] did not, by the time of trial, accurately recall certain details of the shootings does not support an inference he was unconscious when he committed them"].) We therefore turn to other evidence illustrative of whether Ness "lack[ed] awareness of his actions during the course of the offense[ ]." (*Halvorsen*, at p. 418; see *id.* [observing "[t]he complicated and purposive nature of [defendant's] conduct in driving from place to place, aiming at his victims, and shooting them in vital areas of the body" suggested he was aware of his actions while committing the offenses].)

At trial, Ness recalled in detail the events that took place in the moments leading up to his fight with Bonilla, which preceded the shooting by roughly 10 minutes. Ness testified how the tone of the room shifted after Bonilla came home and began cooking porkchops in the kitchen; that Bonilla had his back turned to Ness; that Ness and Bonilla did not acknowledge one another; and that after refilling his drink with a less-than-desired juice, he remarked that "it just tasted horrible" and "made sure

23

[Bonilla] heard it" because Bonilla had drunk the beverages Ness kept in the fridge such that Ness "got stuck with something [he] really didn't want to mix with [his] vodka." Ness also recalled verbatim the words he spoke to Bonilla after Rodgers went home for dinner, why he said them, and Bonilla's response.

Although Ness could not recall what happened in the moments after Bonilla threw him to the ground, Ness testified that he remembered he was walking outside, headed to see Rodgers, when he saw Bonilla inside his car. Ness then pulled out his gun and "immediately fired into the car" when he "saw movement" and heard Bonilla "yelling something about a gun." Ness testified that he "pulled the trigger a few times" and said "not a word" to Bonilla as he did so. At the time, Ness testified, the car door was closed, the window was up, and the lighting was "not very good," as "[i]t was getting dark." Ness stated he did not "see [Bonilla] make any attempt to open the car door." During the shooting, Ness testified, he was afraid for his life and had assumed, based on what he had seen and heard, "some[one] was ready to shoot [him]." And Ness had previously told officers that while he did not recall everything that transpired, he "remember[ed] firing" his gun into the car and that he was "not going to lie about that." When Rodgers came to investigate the gunshots he had heard, he saw Ness's truck driving away.

Thus, even when viewed in the light most favorable to Ness, the evidence does not demonstrate Ness was unconscious due to voluntary intoxication when he shot Bonilla. To the contrary, it shows he was aware of his actions and understood their consequences, as demonstrated by his detailed description of the surrounding events, his recollection of the shooting itself and his thoughts at the time, and his attempt to flee immediately

thereafter by driving away in his truck.  As there is no substantial evidence of Ness's unconsciousness arising from voluntary intoxication at the time of the killing, the trial court correctly refused to give CALCRIM No. 626.  (See *Breverman, supra*, 19 Cal.4th at p. 162.)

In any event, assuming CALCRIM No. 626 should have been given, the trial court's failure to do so was harmless. "Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions."  (*People v. Lewis* (2001) 25 Cal.4th 610, 646.)  In finding Ness guilty of second-degree murder, the jury found true all of the firearm enhancement allegations, including the allegation that Ness personally and intentionally discharged a firearm, a handgun, which caused Bonilla great bodily injury and death.  By finding intentionality, the jury necessarily rejected Ness's theory that he was unconscious due to voluntary intoxication when he shot Bonilla.

Accordingly, Ness has not shown reversal is required based on the trial court's refusal to give CALCRIM No. 626.

## D.    Cumulative Error

Having found meritless Ness's assertions of reversible error, we reject his claim of cumulative error.  (*People v. Bolin* (1998) 18 Cal.4th 297, 345 [rejecting "claim of cumulative prejudice" after "find[ing] virtually no merit to defendant's individual assignments of error"]; *People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068 ["There can be no cumulative error if the challenged rulings were not erroneous"].)

## DISPOSITION

The judgment is affirmed.


                                        SCHERB, J.

We Concur:



STRATTON, P. J.



WILEY, J.